**Document Filed Electronically**
**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| BAILA SEGAL,<br><br>              *Plaintiff*,<br><br>v.<br><br>TOYOTA MOTOR SALES U.S.A, INC, TOYOTA MOTOR CORPORATION, TOYOTA MOTOR NORTH AMERICA, INC., TOYOTA MOTOR ENGINEERING & MANUFACTURING NORTH AMERICA, INC.,JOHN DOES 1-5 (representing fictitious unknown individual service technicians and/or service managers and/or local Toyota dealer owners) and ABC CORPORATION, 4-5 (representing fictitious unknown corporate owners and/or sellers and/or dealers and/or agents),<br><br>              *Defendants*. | Civil Action No.: 3:19-cv-21716-BRM-TJB<br><br>**SECOND AMENDED COMPLAINT and JURY DEMAND** |

Plaintiff Baila Segal by way of First Amended Complaint against Defendants Toyota Motor Corporation, Toyota Motor North America, Inc., Toyota Motor Engineering & Manufacturing North America, Inc., Toyota Motor Sales, U.S.A., Inc., (collectively referred to "Toyota Defendants" or "Toyota" or "Defendants")  avers and says:

### INTRODUCTORY FACTS:

1. David Segal was the owner of a 2008 Toyota Avalon.

2. The vehicle was originally purchased in 2013 by Josef Segal from the dealer LIPAS.

1

3. Ownership of the vehicle was subsequently transferred to David Segal.

4. Plaintiff Baila Segal was a permissive user and operator of the vehicle on April 11, 2019. She was seat belted.

5. On April 11, 2019, in the course of inching the vehicle into an available parking space at Target located at 4955 Route 9 in Howell Township, NJ, the vehicle suddenly and without warning commenced an unanticipated acceleration. In spite of the effort to slow down and control the vehicle, a collision occurred with several parked vehicles.

6. As a result of the multiple impacts, plaintiff sustained severe and permanent injuries to her left leg requiring surgical intervention with open reduction and internal fixation and follow up surgery for hardware removal. Plaintiff continues to undergo medical treatment.

7. The incident was recorded by Target surveillance video which has been provided to plaintiff and to defendant Toyota.

8. Since the time of the accident, upon information and belief, the plaintiff has learned that the original owner of the vehicle was notified of multiple recalls and returned the vehicle to an authorized Toyota dealership for satisfaction of recall repairs.

9. Despite the availability of a brake override system in other Toyota models, also known as smart-throttle technology,

2

the subject 2008 Toyota Avalon was not equipped with a brake override system.   Smart-throttle technology can mitigate the risks associated with unintended acceleration by allowing the driver to quickly, intuitively bring a car to a safe stop by depressing the brake pedal and therefore negating throttle input.

10. For the past 50 years, Toyota has publicly committed itself to building the safest and most reliable cars on the road. Toyota gained trust and loyalty from American consumers, who, in turn, established Toyota's position in 2008 as the number one brand of cars sold in the United States.

11. In the fall of 2009, California Highway Patrol Officer Mark Saylor and his family died in a crash after a 2009 Lexus ES 350 he was driving accelerated out of control. This incident shocked and alarmed the American public, sparking investigations into the extent of unintended acceleration ("UA") incidents, specifically, what Toyota knew, and when they knew it. Internal company documents revealed that Toyota concealed information about UA problems with its vehicles, including the true nature of the defect and the number of resulting incidents, injuries and deaths.

12. From 2002 to 2010, Toyota continuously denied any problems with the throttle control systems on its vehicles. Meanwhile, as a Congressional probe uncovered, Toyota received

3

more than 37,900 reports from customers describing unintended acceleration, surging and/or speed control problems across many models and years.

13. UA has accounted for, at least, 760 crashes. Independent safety researchers estimate that UA-related crashes have led to over 341 injuries and 19 deaths.

14. All Toyota vehicles with the electronic throttle control system ("ETCS") (beginning extensively in Model Year 2002, and some dating back to Model Year 1998) contain design defects that cause sudden and uncontrolled acceleration to speeds of up to 100 miles per hour or more.

15. The affected vehicles are defective because they experience unintended acceleration events and because they lack a mechanism, such as a brake override system, to prevent, mitigate, or stop an unintended acceleration event. Specifically, there are at least three design defects in these vehicles that cause or contribute to dangerous unintended acceleration incidents: (1) vehicles have an inadequate fault detection system that is not robust enough to anticipate foreseeable unwanted outcomes, including unintended acceleration; (2) the Electronic Throttle Control System and its components are highly susceptible to malfunction caused by various electronic failures, including but not limited to faulty circuit boards, short circuits, software glitches, and

4

electromagnetic interference from sources outside the vehicle; and (3) these vehicles lack a brake override system, meaning that the driver is unable to manually stop or slow the engine during an unintended acceleration incident by stepping on the brakes. The absence of an effective fail-safe measure is particularly dangerous given the propensity of Toyota vehicles to suddenly accelerate.

16. These defects alone, or in combination, render certain Toyota vehicles unreasonably dangerous and unable to perform as safely as an ordinary consumer would expect, and otherwise defective.

17. Toyota could have easily implemented an effective brake override system years ago, which would have prevented UA-related incidents, regardless of the precise cause. With a brake override system, when a UA event begins to occur, drivers can override the acceleration or surging by pressing the brake. From at least 2002, Toyota knew or should have known that the state of the art in the automotive industry for electronic throttle control systems included the installation of a brake override system.

18. Internal Toyota documents show that by at least 2007, Toyota knew that installing a brake override system could prevent UA events. Toyota manager Koji Sakakibara stated in a document dated September 1, 2009 that "during the floor mat

sticking issue in 2007 Toyota suggested that there should be failsafe option similar to that used by other companies to prevent unintended acceleration." *(See* Exhibit 1.) Toyota did not heed that suggestion.

19. Despite the feasibility and availability of a brake override system, and despite the fact that Toyota's internal documents show that Toyota was aware of the UA problem, Toyota negligently and recklessly failed to install this protective measure in its vehicles, including the 2008 Toyota Avalon.

20. Even in late 2009 and early 2010 when Toyota announced recalls involving a brake override system, Toyota purposely hid the fact that this redesign was safety-related and critical to preventing UA. Instead, Toyota claimed that the brake override system was "being added as an extra measure of confidence for Toyota owners." *(See* Exhibit 2.)

21. When pressed to explain and implement solutions to UA, Toyota issued recalls to address alleged mechanical issues, such as defective floor mats and sticky accelerator pedals. While these problems undoubtedly posed real dangers for some drivers, a far greater number of vehicles were affected by the ETCS design defects described herein. Indeed, the "sticky pedal" and "floor mat" recalls have failed to adequately address the UA problem. Drivers, such as the plaintiff, continue to report UA

incidents in vehicles that were not part of the recalls, and even among vehicles that were recalled and repaired.

22. Toyota effectively used these "floor mat" and "sticky pedal" problems to downplay and divert attention away from the major design defects and safety problems with the ETCS, including the need for a brake override system. Rather than revealing the truth about its UA electronic/software/hardware defects, Toyota highlighted and promoted the floor mat and pedal recalls as a "smoke screen," while at the same time misleadingly characterizing the "reflashing" of the computer software to allow for brake override as merely a "confidence" boost.

23. Statements from Toyota leadership at the highest levels reveal that Toyota knew and has known that its vehicles present an unreasonable danger, in that they are subject to UA as a result of defects in their design and manufacture, and confirm that Toyota has acted carelessly and recklessly in addressing this problem, including that: (1) Toyota knew in 2007 that other auto companies had installed brake override systems to prevent UA; (2) Toyota acknowledged that TMS had grown too quickly; and (3) Toyota knew the floor mat and pedal recalls do not totally solve the unintended acceleration problem.

24. Toyota promised trust and safety but delivered neither. Rather than recalling the defective vehicles and implementing a feasible and readily available brake override system, Toyota hid the problem and proposed inadequate and misleading solutions. Toyota's actions have resulted in preventable UA, including the plaintiff's collision and resultant injuries.

## JURISDICTION AND VENUE

25. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because the amount in controversy is greater than $75,000, exclusive of interest and costs, and because there is complete diversity of citizenship among the parties.

26. This Court has personal jurisdiction over the Defendants because a substantial portion of the wrongdoing alleged in this Complaint took place in New Jersey, the Defendants are authorized to do business in New Jersey, the Defendants have minimum contacts with New Jersey, and/or the Defendants otherwise intentionally avail themselves of the markets in New Jersey through the promotion, marketing and sale of their products in New Jersey, each of which are sufficient bases to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

8

27. Venue is proper in the District of New Jersey pursuant to 28 U.S.C. § 1391(a) and (b) because a substantial part of the events, acts and omissions giving rise to these claims occurred in the District of New Jersey, and Plaintiff resides in New Jersey.

## PARTIES

28. Plaintiff Baila Segal is a citizen of the United States and the State of New Jersey residing at 149 Forest Park Circle, Lakewood, New Jersey.

29. Toyota Motor North America, Inc. is a holding company of sales and manufacturing subsidiaries of Toyota Motor Corporation in the United States and is a California corporation and a resident and corporate citizen of California, with its principal place of business in Torrance, California. Its services include government and regulatory affairs, energy, economic research, philanthropy, corporate advertising and corporate communications.

30. Defendant Toyota Motor Engineering & Manufacturing North America, Inc. is a subsidiary of Toyota Motor North America, Inc. and is a Kentucky corporation and a resident and corporate citizen of Kentucky, with its principal place of business in Erlanger, Kentucky.

31. Toyota Motor Sales, U.S.A., Inc. is a subsidiary of Toyota Motor North America, Inc. and is a corporation of the State of California corporation with its principal place of business in Plano, Texas.

9

32. Upon information and belief, each Toyota entity named above is a wholly owned subsidiary of Defendant Toyota Motor Corporation, a Japanese corporation with its principal place of business located at 1 Toyota-Cho, Toyota City, Aichi Prefecture, 471-3571, Japan.  The foregoing Defendants are collective to as "Toyota".

33. At all times referenced herein, Defendants were acting as the agents and employees of each of the other Defendants, and were acting within the scope, purpose, and authority of that agency and employment and with the full knowledge, permission, and consent of each of the other Defendants.

## FACTS COMMON TO ALL COUNTS

### I. Toyota's Unintended Acceleration Defect

**A.   Toyota Electronic Throttle Control System Susceptibility and Unintended Acceleration Problems**

34. Beginning in the late 1990s, Toyota manufactured, distributed and sold vehicles with an electronic throttle control system ("ETCS vehicles" or "subject vehicles"). Unlike traditional throttle control systems, ETCS has no physical linkage from the accelerator pedal to the engine throttle; rather a sensor at the accelerator detects how far the gas pedal is depressed and transmits that information to computer modules, which control a motorized engine throttle. The computer modules determine how far the accelerator is

10

depressed, and, in turn, tell the engine throttle motor how far to open the throttle valve.

35. When Toyota first introduced the ETCS, it continued to include a mechanical linkage between the accelerator and the engine throttle control.

36. Beginning in Model Year 2002 on most models, and in approximately 1998 on other higher end models, Defendants began manufacturing, distributing and selling vehicles without such mechanical linkage.

37. The ETCS, as a computer-based system, is highly susceptible to malfunction, or "glitches," caused by various electronic and mechanical failures, including but not limited to short circuits, software errors, and electromagnetic interference from sources outside the vehicle.

38. Despite known hardware, software and component problems, ETCS vehicles do not have adequate safeguards to protect drivers from UA. The fault detection system in these vehicles is not robust enough to detect and prevent foreseeable UA events.

39. Additionally, the subject vehicles lack a brake override system, incorporated by other vehicle manufacturers, that instructs the ETCS to automatically reduce the engine power to idle whenever the brakes are applied. This measure is critical, as a significant number of motorists that experienced

11

UA reported that no amount of braking would stop the vehicle. Moreover, the absence of a fail-safe brake override system is particularly dangerous given the susceptibility of the ETCS to malfunction in Toyota vehicles.

40. These defects alone, or in combination, are lethal. In the subject vehicles, an ETCS malfunction can set the engine throttle to any speed, regardless of the position of the accelerator, and the driver has no mechanism to effectively stop or slow the car.

41. Toyota's own data reveals that UA has accounted for at least 760 crashes. Independent safety experts at Safety Research and Strategies, Inc. estimate that UA-related crashes have led to approximately 341 injuries and 19 deaths.

**B.   Toyota's Knowledge Regarding UA Defects**

42. Toyota has received evidence for many years that its vehicles have accelerated suddenly and unexpectedly in a variety of scenarios. In February 2002, Toyota received what is believed to be the first consumer complaint alleging that the engine surged while the brakes were depressed. By August 2002, Toyota had received ten other similar complaints. Toyota allegedly investigated the surging problem but failed to uncover the root cause. According to a May 20, 2002 internal report, Toyota claimed that the "root cause of the surging

12

condition remains unknown" and "no known remedy exists for the surging condition at this time."

43. In February 2003, The National Highway Traffic Safety Administration ("NHTSA") conducted its first of many investigations regarding speed control problems in Toyota vehicles. The first two NHTSA investigations involved the Camry and Solara models.

44. On April 25, 2003, NHTSA issued Defect Petition DP03 003. The petitioner requested that the agency conduct an analysis of 1997 through 2000 Lexus vehicles for "problems of vehicle speed control linkages which results [sic] in sudden, unexpected excessive acceleration even though there is no pressure applied to the accelerator pedal." The petitioner noted that the NHTSA website contained thirty-six complaints referring specifically to unintended acceleration in Lexus vehicles. Among the several complaints that described crashes, one complaint described a Lexus that "collided with five other cars in the space of [one half] mile before it could be stopped".

45. In April 2003, Toyota dealt internally with an "unwanted acceleration" incident during production testing of the Sienna model.

46. In a May 5, 2003 Field Technical Report (FTR), Toyota admitted that "[s]udden acceleration against our intention,"

13

was an "extremely serious problem for customers." In the FTR, a Toyota technician internally reported an "unwanted acceleration" incident: "We found miss-synchronism between engine speeds and throttle position movement...Even after replacement of those parts, this problem remains." The technician requested immediate action due to the "extremely dangerous problem" and continued: "[W]e are also much afraid of frequency of this problem in near future."

47. In July 2003, at an owner's request, NHTSA opened the first probe into UA complaints regarding Lexus sedans.

48. In January 2004, another consumer filed a petition with NHTSA, requesting an investigation into 2002 and 2003 Lexus ES 300s, "alleging that [her] throttle control system malfunctioned on several occasions, one of which resulted in a crash."

49. In March 2004, NHTSA opened a wider probe into Lexus sedans after receiving another complaint "alleging that the throttle control system fails to properly control engine speed resulting in vehicle surge." NHTSA also notified Toyota that it was opening an investigation of unwanted acceleration and vehicle surge in 2002-2003 Camry and Solara models. Specifically, NHTSA investigated the following complaints from vehicle owners:

14

  i. Allegations of (A) an engine speed increase without the driver pressing on the accelerator pedal or, (B) the engine speed failing to decrease when the accelerator pedal was no longer being depressed — both circumstances requiring greater than expected brake pedal application force to control or stop the vehicle and where the brake system functioned normally.

50. On June 3, 2004, NHTSA investigator Scott Yon sent an email to Christopher Santucci (a high level Toyota employee in Technical and Regulatory Affairs) that shows a greater than 400 percent difference in "Vehicle Speed" complaints between Camrys with manually controlled throttles and those with electronically controlled throttles. (*See* Exhibit 3.) This statistically significant difference put Toyota on notice that its vehicles with ETCS had a defect that could potentially cause UA.

51. On July 22, 2004, NHTSA closed its investigation into the Lexus sudden acceleration complaints (petition PE04-021) without formally identifying a defect, stating that "[a] defect trend has not been identified at this time and further use of agency resources does not appear to be warranted." Citing a lack of resources, NHTSA subsequently turned down two

more requests from consumers to investigate the problem. Significantly, NHTSA conducted no testing of the integrity of the ETCS and did not review any records of Toyota's test reports concerning the ETCS. Notably, NHTSA did not conduct any tests as to the efficacy of the braking system in an open-throttle condition.

52. In May 2004, a forensic technologist and mechanical engineer examined a vehicle in New Jersey that had experienced a UA event. They prepared a report that concluded that the vehicle's ETCS was not operating correctly. Toyota received the report on January 13, 2005.

53. In August 2005, NHTSA evaluated the Toyota Camry after reports of some "inappropriate and uncontrollable vehicle accelerations."

54. In November 2005, Toyota wrote to NHTSA and stated that a dealership-led review of 59 owner claims regarding their Toyotas found "no evidence of a system or component failure" and stated that the "vehicles operated as designed."

55. In January 2006, NHTSA opened a second investigation into Toyota Camry models. NHTSA received questionnaires from Camry owners who reported hundreds of problems with acceleration and braking. After communicating with Toyota, NHTSA closed the investigation without

16

identifying a specific defect and stated that the claims had "ambiguous significance."

56. In August 2006, NHTSA continued to receive more complaints about accelerator problems with the 2002-2006 Camry models.

57. In September 2006, NHTSA opened a third investigation into reported "engine surging" incidents with Toyota vehicles. Toyota represented to NHTSA that there was no abnormality in the throttle control system, and instead blamed water damage. NHTSA closed this investigation without identifying a specific defect, citing "the need to best allocate limited administrative resources."

58. In March 2007, NHTSA launched a probe into the floor mats of Lexus models. In response, Toyota claimed that the "issue is not a safety concern." On August 8, 2007, NHTSA's Office of Defect Investigation ("ODI") upgraded this preliminary evaluation to an engineering analysis to investigate UA in a target population of 98,454 model year 2007 Lexus ES 350s. The Opening Resume for EA07-010 states, in part, as follows:

> [T]he agency has 40 complaints; eight crashes and 12 injuries. Complainants interviewed by ODI stated that they applied the throttle pedal to accelerate the vehicle then experienced unwanted

acceleration after release. Subsequent (and sometimes repeated) applications of the brake pedal reduced acceleration but did not stop the vehicle. In some incidents drivers traveled significant distances (miles) at high vehicle speeds (greater than 90mph) before the vehicle stopped (ODI notes that multiple brake applications with the throttle in an open position can deplete the brake system's power [vacuum] assist reserve resulting in diminished braking).

59. In September 2007, Toyota recalled 55,000 Camry and Lexus models under pressure from NHTSA due to floor mats that purportedly interfered with the accelerator pedal.

60. In January 2008, NHTSA launched a probe into UA problems in Tacoma pickups after receiving notice of 478 incidents with 2004-2008 models. In response, Toyota told NHTSA that an investigation was not warranted due to lack of evidence to support drivers' allegations.

61. In August 2008, NHTSA closed its investigation of the Tacoma without specifically identifying a defect, despite hundreds of complaints. The Tacoma probe marked the eighth investigation into UA problems in Toyota vehicles since 2003. By August 2008, NHTSA had received more than 2,600 complaints regarding "run away" Toyota vehicles.

62. Rather than provide appropriate repairs, Toyota often blamed drivers for UA incidents. Yet, when pressed, Toyota technicians have acknowledged the defects in Toyota vehicles, such as the experience described in this consumer e-mail, dated February 6, 2009:

"We just got a 2008 LE 4Cyl with the 5spd auto. Only had it two weeks. When driving 35-45mph, the tranny will shift up into 5th gear and then basically STAY there. As we approach a slight upward grade, the tachometer is stuck at 1200 RPM and the whole car shudders and vibrates as the engine "lugs" down. We find ourselves constantly playing with the gas pedal in order to FORCE the tranny to downshift. Took it to dealer. They experienced same thing. They said it was `Normal for this model - at this time.' They quietly told me they are getting other complaints and look forward to Toyota releasing new programming for the ECU."

63. In April 2009, NHTSA received another petition for an investigation into Toyota vehicles for throttle-control problems unrelated to floor mat issues.

C.   **Mark Saylor Accident and Resulting Worldwide Public Scrutiny,   Congressional   Probes,   and   Wider   Recalls**

64. On August 28, 2009, California Highway Patrol officer Mark Saylor and his family were killed when the Toyota vehicle

19

(Lexus ES350) he was operating accelerated out of control to over 100 mph. In a chilling "911 call," moments before the crash, a passenger said, "We're in trouble. There's no brakes."

65. In September 2009, NHTSA and Toyota issued consumer alerts, warning consumers to remove floor mats because of a potential to jam the accelerator, causing sudden unintended acceleration.

66. In October 2009, Toyota continued receiving reports in the United States and Canada that pedals were sticking in certain models. Toyota then issued a floor mat recall on 4.2 million Toyota and Lexus vehicles, advising consumers to remove floor mats and place them in the trunk, and directing dealers to use zip ties to secure floor mats to avoid gas pedal interference.

67. In November 2009:

a. Toyota expanded the floor mat recall by over a million vehicles, and issued a press release claiming that NHTSA found no defect in the vehicles. NHTSA publicly rebuked Toyota, calling Toyota's press release "inaccurate" and "misleading," noting that the floor mat recall was an "interim" measure and that it "does not correct the underlying defect." Toyota publicly apologized for its inaccurate press release.

Ultimately, Toyota included 5.3 million vehicles in the Floor Mat recall.

    b.  News outlets continued uncovering evidence of widespread problems, and Toyota's concealment of those problems. The Los Angeles Times reported that Toyota ignored more than 1,200 UA complaints over the preceding eight years. Toyota also issued another press release denying proliferating media reports that a problem existed with its ETCS.

    c.  Toyota instructed dealers to shorten the gas pedal so it would not interfere with floor mats.

68. In December 2009, NHTSA opened an investigation into whether the electronic control modules in Corolla and Camry models caused them to stall without warning. It opened another investigation into the 2003 Sequoia SUV model for problems with the computerized vehicle stability control system.

69. In January 2010:

    a. Toyota told NHTSA that some vehicles may have "an issue" with sticking accelerator pedals, independent of the floor mat issue (though some vehicles contained both defects). At NHTSA's command, Toyota initially issued a recall for sticking accelerator pedals affecting 2.3 million vehicles. It subsequently expanded the "sticky

pedal" recall to include a total of 3.4 million vehicles.

b. United States Transportation Secretary Ray LaHood told a Chicago radio station that the government had asked Toyota to stop selling recalled vehicles.

c. Toyota announced that a brake override software "fix" would be applied to its vehicles globally by 2011.

d. On January 26, 2010, after ever-increasing adverse publicity, Toyota stopped selling its recalled models, stating that preventing the sale of the vehicles was "necessary until a remedy is finalized." Then, approximately a week later, Toyota completely reversed course and began selling the defective vehicles.

70. In February 2010:

a. Transportation Secretary Ray LaHood testified before a Congressional panel cautioning drivers to seek repairs for sticking accelerators.

b. Kelly Blue Book said affected Toyota models were devalued as much as five percent. Edmunds stated that the average devaluation was between four and eight percent.

c. Toyota admitted that there was a brake software problem in 2010 Prius Hybrids. Toyota later recalled the 2010 Prius, Lexus HS 250h and Camry Hybrids due to faulty brakes (437,000 vehicles worldwide).

**D.  Toyota's  Admitted  Failure  to  Meet  Consumers' Expectations for Safety**

71.  In October 2009, Akio Toyoda (President and CEO of Toyota Motor Corporation) issued a public apology to the Saylor family and every customer affected by the recall, admitting: "Customers bought our cars because they thought they were the safest but now we have given them cause for grave concern. I can't begin to express my remorse."

72.  Additionally, in his prepared testimony before the Committee on Oversight and Government Reform of the U.S. House of Representatives on February 24, 2010, Toyoda admitted that Toyota's growth in recent years was "too quick," and the company's priorities of "first, safety; second, quality; third, volume" had become "confused." Mr. Toyoda went on to apologize to American consumers, "I regret that this has resulted in the safety issues described in the recalls we face today, and I am deeply sorry for any accidents that Toyota drivers have experienced."

73.  Yoshimi Inaba, President and Chief Executive Officer of Toyota Motor North America, Inc., likewise acknowledged that

23

Toyota had failed its customers. Mr. Inaba testified in the Senate Sub-Committee hearings on the Toyota recalls as follows:

In recent months we have not lived up to the high standard our customers and the public have come to expect from Toyota, despite our good faith efforts. As our president, Akio Toyoda, told members of Congress last week, we sincerely regret our shortcomings have resulted in the issues associated with our recent recalls.

74.   Shinichi Sasaki, executive Vice President for Toyota Motor Corporation admitted before Congress that Toyota "did not listen to its consumers":

How this issue came about is because there were many vehicle — excuse me — many voices were sent to us from the customers, but we really did not listen to every one of them very carefully, one by one. We should have really listened to them carefully and rendered some technical analysis so that it would be connected to our following product improvement. However, the quality of this work or the efficiency of our work or speed with which we worked had become sluggish, or sort [sic] failed gradually, and this has come to a much larger issue.

II.   **Toyota's Purported Fixes Do Not Address The Root Causes Of Unintended Acceleration**

75.   Despite the flurry of media attention, NHTSA activity and Congressional scrutiny, Toyota has still not adequately addressed the root cause of UA.

76. While sticky pedals and floor mats likely did contribute to some UA incidents, Toyota used these issues as a smoke screen to hide the electronic defects in their vehicles.

77. Toyota never made any significant changes to improve the acceleration system and the ETCS, despite the availability of safe and inexpensive alternative designs and feasible modifications. Rather, Toyota has repeatedly stated to consumers, the media, its dealers, and Congress, that its vehicles' electronic acceleration systems are not the cause of UA incidents.

78.   Despite Toyota's public position, evidence continues to mount that the recalls focused on limited mechanical issues are inadequate to prevent UA, and that the vehicles' electronics cannot be ruled out as a likely cause of the incidents.

79. As *The New York Times* reported on March 2, 2010, "an analysis of government documents shows that many Toyota Camrys built before 2007, which were not subject to recalls, have been linked to a comparable number of speed-control problems as recalled Camrys." A study of Japan's government

25

records revealed a similar finding. As a result, the U.S. Department of Transportation has included pre-2007 Camrys in their broader investigation of the role that ETCS may be playing in these incidents.

80. Further, affected vehicles that have been recalled and repaired continue to suffer UA incidents. On March 4, 2010, just months after Toyota issued two independent recalls related to UA, NHTSA revealed that it had received over 60 UA complaints in Toyota vehicles that had been repaired pursuant to the recalls. As *The Los Angeles Times* reported, the complaints included several crashes and at least three injuries. On March 17, 2010, the Associated Press reported that the number of post-recall incidents had reached over 100.

81. The Camry findings and the post-recall incidents greatly undermine Toyota's public position, and confirm that the ETCS is the likely source of UA.

82. Toyota admits that the recalls have not addressed the UA problem. When questioned before a Congressional panel, Toyota's top U.S. sales executive, James Lentz, admitted that Toyota could not rule out electronics problems, and that the two recalls would "not totally" solve the problem. Among other potential causes, Mr. Lentz identified software problems,

faulty cruise control, and engine revs caused by engaging the air conditioner.

83. Additionally, numerous independent experts have spoken out in recent months to challenge Toyota's inexplicable confidence in its electronic systems.

84. For example, David M. Cummings, executive vice president of the Kelly Technology Group in Santa Barbara, California, has 30 years' experience in building computer systems embedded inside other devices, including nine years as a consultant for the Jet Propulsion Laboratory where he worked on the Mars Pathfinder spacecraft. In an opinion piece in *The Los Angeles Times* on March 12, 2010, Mr. Cummings dismissed Toyota's repeated statements that its electronics could not be faulted, and explained that there are "software bugs" that simply cannot be reproduced in a laboratory test environment.

85. Toyota knew by 2007 that UA was often not traceable, meaning that failure could not be effectively ruled out. In an October 19, 2007 e-mail, Chris Tinto admitted: "[O]ne big problem is that no codes are thrown in the ECU so the allege [sic] failure (as far as we know) can not be documented or replicated." The implications were that "the service tech therefore can't fix anything, and has no evidence that any problem exists." (*See* Exhibit 4.)

86. The unpredictability of electronics and software is further highlighted by strange and dangerous incidents in affected vehicles that received a supposed software upgrade as part of the recall. As *The Los Angeles Times* summarized in a March 3, 2010 article:

> A 2007 Camry driver from Sherrill, New York, for example, said that since the repair, the car idles fast in reverse, cruise control does not disengage properly and various check engine lights come on. The owner of a 2005 Avalon in Houston, meanwhile, said that following the recall service, his wife stepped on the gas and found that nothing happened, causing it to lose speed on the highway.

87. Toyota knows, or should know, that its electronics are not infallible. Software problems have arisen in other Toyota vehicles. On February 8, 2010, Toyota announced a voluntary safety recall on some of its models to update software in the vehicle's anti-lock brake system (ABS), in response to braking problems experienced by drivers. This recall involves approximately 133,000 Model Year 2010 Prius vehicles and 14,550 Model Year 2010 Lexus HS 250h vehicles.

88. More generally, over the last two decades, various Toyota and Lexus vehicles have been recalled due to electronics and software defects that led to engine surging, engine racing,

and unintended engagement of headlights and taillights,
according to a *Los Angeles Times,* February 14, 2010 article.
As far back as 2003, Toyota had to "recalibrate" the
Electronic Control Modules in certain 2003 Camrys due to
engine "surging."

89. Further, Toyota has known for some time that the
inherent complexity and unpredictability of vehicle
electronics and software counsels the use of a properly
designed brake-to-idle override system that allows drivers to
bring a vehicle under control in the event of a UA incident.
According to documents presented to Congress, and as reported
in *The Los Angeles Times,* in 2007, NHTSA asked Toyota to
consider installing software to prevent sudden acceleration
in its vehicles after receiving yet another round of UA
complaints in Toyota vehicles.

90. In an internal August 2007 e-mail, entitled "UPDATE
on ES 350 investigation," Chris Santucci, a Toyota manager,
stated that he and NHTSA investigators discussed fail-safe
mechanisms used by other vehicle manufacturers to protect
against unintended acceleration, including "[u]sing ETC to
shut down throttle control" and "cutting off the throttle when
the brakes are applied." Mr. Santucci also noted, "Jeff
[Quandt, Chief, Vehicle Controls Division, Office of Defects
Investigation] mentioned that another manufacturer allows the
engine to be shut off if you press the ignition button
repeatedly."

91. Further, a September 1, 2009 email "[t]o all concerned staff" from Koji Sakakibara shows that Toyota was aware of the UA problem back in 2007, but opted not to develop additional safety measures at that time:

To all concerned staff, the following information has been received from TMS-PQSS Public Affairs Group regarding the above (America ES350 article...addition

#2). (Please see photos at the bottom of this mail.) Within America, there are 196 articles on Google News, so the mass media is interested.

- During the floor mat sticking issue of 2007, TMS suggested that there should be "a fail safe option similar to that used by other companies to prevent unintended acceleration".

I remember being told by the accelerator pedal section Project General Manager at the time (Mr. M) that "This kind of system will be investigated by Toyota, not by Body Engineering Div".

Also, that information concerning the sequential inclusion of a fail safe system would be given by Toyota to NHTSA when Toyota was invited in 2008. (The NHTSA knows that Audi has adopted a system that closes

the throttle when the brakes are applied, and that GM will also introduce such a system.)

In light of the information that "2 minutes before the crash an occupant made a call to 911 stating that the accelerator pedal was stuck and the vehicle would not stop", I think that Body Engineering Div. should act proactively first (investigate issues such as whether the accelerator assay structure is the cause, how to secure the floor mats, the timing for introducing shape improvements). - Furthermore, taking into account the circumstances that "in this event a police officer and his entire family including his child died", TMS-PQSS Public Affairs Group thinks that "the NHTSA and the USA public already hold very harsh opinions in regards to Toyota". (As I think you know, in some cases in the USA "killing a police officer means the death penalty".) - In light of the above, it would not be an exaggeration to say that even more than the nuance of the information passed from Customer Quality Engineering Div. External Relations Dept. to Body Engineering Div, "the NHTSA is furious over Toyota's handling of things, including the previous Tacoma and ES issues. Considering the importance of this matter, any correspondence

31

regarding this issue including the reply from Body
Engineering, no matter how small, must be sent to the
Customer Quality Engineering Div. General Manager and
the Customer Quality Engineering Div. External
Relations Dept. General Manager. (If possible, please
exchange information with the Customer Quality
Engineering Div. rather than replying to me.)

> (*See* Exhibit 1) (emphasis added).

92. Not only did Toyota decline to develop additional
safety measures, but its officials actually bragged in July
2009 about avoiding a costly whole-scale recall related to
sudden acceleration complaints. According to an internal
presentation from Toyota's Washington office, a limited recall
saved Toyota more than $100 million. The document notes that
Toyota's safety officials had saved the company significant
expense by limiting the recall to 55,000 floor mats in 2007.
"Negotiated 'equipment' recall on Camry/ES re SA (Sudden
Acceleration); saved $100M+, w/ no defect found," the document
said. This internal document is further evidence that Toyota
knew about the UA problem and nonetheless decided to avoid a
recall of the affected vehicles, in conscious disregard for
the safety of consumers, including Plaintiffs.

93. After profiting from the inadequate 2007 floor mat recall, and in response to increasing pressure from NHTSA, Toyota conducted an internal feasibility study of brake override technology in 2008. The study was prompted by a memo from a Toyota employee entitled "Unwanted Acceleration Investigations on Toyota Vehicles." In light of "increasing scrutiny" from NHTSA, the memo requested that Toyota Motor Corporation (in Japan) conduct a feasibility study evaluating the use of the electronic throttle control system "to reduce throttle opening/engine power" as a way to eliminate sudden acceleration. The memo's unidentified author noted that simultaneous application of both pedals during an unintended acceleration event "should be easily detectable by the engine ECU." Toyota ultimately declined to install this important safety feature in any of its vehicles at that time.

94. Unable to hide the risks imposed by its ETCS any longer, Toyota announced a plan to put brake overrides in new vehicles by the end of 2010. Additionally, Toyota is allegedly installing the system on some of the following recalled vehicles: 2005-2010 Toyota Tacoma, 2009-2010 Venza, 2008-2010 Sequoia, 2007-2010 Camry, 2005-2010 Avalon, 2007-2010 Lexus ES 350, 2006-2010 Lexus IS 350, and 2006-2010 Lexus IS 250. As Toyota stated in connection with this second recall:

In addition, as a separate measure independent of the vehicle-based remedy, Toyota will install a brake override system into the involved Camry, Avalon, and Lexus ES 350, IS 350 and IS 250 models as an extra measure of confidence. This system cuts engine power in case of simultaneous application of both the accelerator pedal and brake pedals.

95. Yet, Toyota has failed to install this safety feature on all of the recalled vehicles, let alone the larger universe of affected vehicles.

96. Not only has Toyota denied this important safeguard to millions of its customers, but the failsafe it has installed on select vehicles appears to be ineffective and inadequately tested. As noted above, drivers have reported more than 100 UA incidents in vehicles successfully recalled and repaired. Frighteningly, these new complaints involve the Avalon, Camry, and Matrix — all of which allegedly received brake override software as part of the recall, according to Toyota.

### III. Toyota's Concealment Of The Defects

97. As demonstrated above, Toyota was aware of the defective nature of the acceleration control and throttle system in its vehicles since at least 2002, but failed to adequately and accurately disclose these facts to Plaintiffs, the public,

34

and NHTSA. Toyota concealed these facts and continued to make statements touting the reliability and safety of its vehicles, including the subject vehicles with dangerous defects that Toyota knew had caused and were likely to cause further serious injuries and deaths.

**A.     Toyota's Failure to Disclose that Certain Vehicles had Electronics Problems that Caused Unintended Acceleration**

98. Toyota has consistently denied any electronic causes of UA, while quietly issuing bulletins to fix problems with its electronic throttles.

99. Between August 2002 and May 2003, Toyota issued to its dealers three "Technical Service Bulletins," which acknowledged surging problems in certain Camry vehicles. Two of these bulletins advised dealers that Toyota made repairs to the Engine Control Model (an electronic system) to correct the problem. Toyota never disclosed the existence or content of these bulletins to NHTSA or the public.

**B.     Toyota's Concealment of its Own Technicians' Ability to Replicate and Confirm Unintended Acceleration Events**

100. During the relevant period, Toyota failed to disclose to consumers how its own technicians were continuing to replicate UA events.

101. In April 2003, Toyota dealt internally with an "unwanted acceleration" incident during production testing of the Sienna model. Toyota blamed a "faulty trim panel clip,"

deemed it an isolated incident, and did not make such information available to NHTSA until five years later.

102. As discussed above, in a May 5, 2003 "Field Technical Report, Toyota admitted that "[s]udden acceleration against our intention," was an "extremely serious problem for customers." A Toyota technician internally reported an "unwanted acceleration" incident: "We found miss-synchronism between engine speeds and throttle position movement. . . . Even after replacement of those parts, this problem remains." The author requested immediate action due to the "extremely dangerous problem" and continued: "[W]e are also much afraid of frequency of this problem in near future."

103. Between 2006 and 2010, two Toyota technicians in Hong Kong witnessed eighteen incidents of UA. These incidents, documented in Field ,Technical Reports ("FTR"), show that Toyota knew of the frequency of UA in their vehicles and that its own dealers recognized this and advised Toyota that it was urgent to investigate.

104. On June 8, 2007, in a FTR, one of the Toyota technicians in Hong Kong reportedly experienced UA during routine maintenance of a vehicle at a Lexus Service Center. The technician stated that "[a]lthough the accelerator pedal had been released, the engine still maintained at high speed (over 5500 rpm) and it went on to the red zone."

36

He goes on to describe how "[t]he accelerator pedal was inspected, but no abnormality was found, no DTC was found and the carpet is genuine Lexus parts and no aftermarket carpet was fitted." The technician "strongly request[ed] TMC to investigate this case in a very top priority, since the case is highly related to vehicle safety and there is a highly potential danger [sic] of severe traffic accident." This incident is the third of its kind within eight months. Over the course of three years, the same two technicians report fifteen more cases to Toyota.

105. In another FTR from one of the technicians in Hong Kong, dated September 28, 2007, a similar UA event was reported with a targeted investigation of the ETCS. There were no DTCs recorded and the root cause was unknown. The resulting report by Denso Corporation, the manufacturer of the accelerator pedals in many of the subject vehicles, confirmed that they could not find any abnormalities on any accelerator components. In the corresponding reply from TMC, dated April 21, 2008, Toyota acknowledged that this was an issue that needed to be monitored.

106. Additionally, in a December 12, 2008 Field Technical Report regarding a UA event, a technician stated: "After traveling 20-30 feet the vehicle exhibited a slight hesitation then began to accelerate on its own. Engine

speed was estimated to have gone from 1500 rpm to 5500 rpm at the time of the occurrence...Probable Cause =Unknown." Toyota hid these reports and continued to deny that UA existed.

### C. Toyota's Attempts to Deliberately Frustrate Government Investigations and Conceal Information from the Public and NHTSA Regarding Unintended Acceleration Problems

107. Toyota successfully delayed and narrowed NHTSA investigations through, in part, a cozy relationship between NHTSA's designated Toyota investigator, Scott Yon, and Toyota executives, some of whom were former NHTSA employees.

108. In March 2004, NHTSA notified Toyota that it was opening an investigation of unwanted acceleration and vehicle surge in Lexus sedans and 2002-2003 Camry and Solara models. The investigation was expected to cover more than one million 2002-2003 Camry, Camry Solara and Lexus ES 300 vehicles, as the agency had received 37 complaints and reports of 30 crashes resulting in five injuries. Toyota successfully narrowed the investigation to eleven incidents involving five crashes.

109. At the outset of this March 2004 investigation, NHTSA asked Toyota for information on similar incidents including the number of complaints, field reports, crash reports, property damage claims and lawsuits. The decision on how to respond to NHTSA emanated from a group of Toyota employees, including Christopher Tinto and Christopher Santucci in Washington, D.C., as well as others from the

Product Quality and Service Support group in Torrance, California. The scope of NHTSA's information request became the subject of negotiations between Christopher Tinto and Christopher Santucci of Toyota and NHTSA representatives, with the result that certain relevant categories of incidents were excluded from Toyota's reporting of events.

110. In its response to NHTSA's 2004 information request, Toyota denied that a defect existed, stated that no defect trend had emerged, and that its ETCS could not fail in ways its engineers had not already perceived. Toyota reported complaints that it said "may relate to the alleged defect." Toyota excluded from its response, however, the following relevant categories of complaints, among others:

(1)     an incident alleging uncontrollable acceleration that occurred for a long duration;

(2)     an incident in which the customer alleged that he could not control a vehicle by applying the brake; and

(3)     an incident alleging unintended acceleration occurred when moving the shift lever to the reverse or the drive position.

111. The Toyota Defendants thus concealed from NHTSA and the public an entire universe of potentially relevant customer complaints.

112. Toyota also failed to disclose expert reports concerning ETCS failure. As discussed above, in May 2004, a forensic technologist and mechanical engineer examined a vehicle

in New Jersey that had experienced a UA event. Their report concluded that the vehicle's ETCS was not operating properly. Toyota received the report on January 13, 2005, but did not disclose the results to NHTSA.

113. Internal documents show that Toyota management wanted to avoid NHTSA investigations. For example, in September 2006, when ODI opened Defect Petition DP06-003 to investigate incidents relating to vehicle surging in 2002-2006 Camry and Camry Solara vehicles, Chris Santucci wrote to colleagues: "Hopefully, this is just an exercise that NHTSA needs to go through to meet its obligations to the petitioner. Hopefully, they will not grant the petition and open another investigation." (*See* Exhibit 5.)

114. Moreover, Toyota leadership sought to avoid any tough questions from NHTSA regarding ETCS. In a February 27, 2007 e-mail to Christopher Santucci, Michiteru Kato wrote knowledgeable ECU engineer to an ECU demonstration being conducted for NHTSA to avoid questions regarding ECU failures: ". . . I thought that 3 guys from TMS is too many (two at most), and if the engineer who knows the failures well attends the meeting, NHTSA will ask a bunch of questions about the ECU. (I want to avoid such situation)." (*See* Exhibit 6.)

115. On March 2007, Toyota attempted to prevent NHTSA from opening an investigation in 2007 Lexus 350 vehicles, offering to send a letter to owners "reminding them not to install all weather mats on top of existing mats." Acknowledging the potential harm to Toyota's bottom line, Chris

Tinto wrote, "NHTSA feels that they have too many complaints on this one vehicle to drop the issue; The results of a stuck throttle are 'catastrophic.'" (See Exhibit 7.)

116. Toyota also sought to keep information from the public regarding UA. For example, in December 2005, Toyota sent letters to owners in connection with the NHTSA IS 250 All Weather Drive investigation. An e-mail from Toyota employee George Marino reveals that Toyota Motor Company purposely removed any reference to speed control from the letters. Marino wrote, "They pulled out the 'vehicle speed control' part. NHTSA may come back, but TMC wanted to try." (See Exhibit 8.)

117. Further, Toyota never fully disclosed to the regulators the actual numbers of customer reports of UA events in the various Toyota models under investigation that the company had received. In fact, Toyota disclosed that it had received only 1,008 such complaints. Three years later, however, Toyota would be required to disclose to Congressional investigators that it had received 37,900 complaints potentially relating to sudden acceleration in defective vehicles from January 1, 2000 through January 27, 2010.

### D.    Toyota's Use of the Floor Mat and Sticky Pedal Recalls as a Smoke Screen to Hide ETCS Defects

118. Given the "potentially catastrophic" effects of an ETCS recall, Toyota tried to focus attention instead on

"mechanical" problems, like floor mats and sticky pedals. In an email dated April 2, 2007, George Morino urged others within Toyota to re-frame the investigation as an "All Weather Floor Mat issue," and carefully eliminated reference to the much broader and more alarming issue of unintended acceleration:

> Sorry we had a last minute change to the Q&A. Please utilize this revised version of the Statement and Q&A. The issue has been posted on the NHTSA website.
>
> Sorry!
>
> [Old]
>
> NHTSA has received five consumer complaints regarding unintended throttle control in the subject vehicles.
>
> [New]
>
> NHTSA received five consumer where the All Weather Floor Mat may have interfered with the accelerator pedal operation.
>
> (*See* Exhibit 9.)

119. A September 14, 2007 email from Chris Tinto demonstrates that internally, Toyota executives were pleased that NHTSA had limited the ES350 unintended acceleration issue to a "floor mat" recall, and that this limitation saved the company "upwards of one hundred million dollars:"

Of note, NHTSA was beginning to look at vehicle design parameters as being a culprit, focusing on the accelerator pedal geometry coupled with the push button "off' switch. We estimate

42

that had the agency instead pushed hard for recall of the throttle pedal assembly (for instance), we would be looking at upwards of $100M + in unnecessary cost. (See Exhibit 10.)

120. In an internal Toyota PowerPoint presentation by Chris Tinto dated January 2008, Toyota characterized the Camry and Lexus ES floor mat investigation as a "difficult issue" that it "ha[d] been quite successful in mediating." The presentation went on to note that such "mediations" were "becoming increasingly challenging" and that "despite the fact that we rigorously defend our products through good negotiation and analysis, we have a less defensible product."

121. Further, Toyota continued to promote the floor mat recalls even though it knew that floor mat interference could not alone explain the propensity of certain makes and models to experience UA. As of September 2007, Toyota executives internally acknowledged that that "floor mat interference is possible in any vehicle with any combination of floor mats." (See Exhibit 11.)

### E. Toyota's Agreement to Pay a $16.375 Million Fine for Hiding Safety Defects

122. On April 5, 2010, NHTSA informed Toyota in a letter that it was imposing a record $16.375 million fine for hiding safety defects related to sudden acceleration in 2.3 million vehicles. Under federal law, automakers are required to disclose

43

defects to NHTSA within five business days. Yet, Toyota had failed to notify NHTSA for at least four months after learning that the accelerator pedals in some of its vehicles could stick and cause UA. In its April 5th letter, NHTSA noted how Toyota had sent instructions to its European operations in September 2009 explaining how to fix sticky accelerator pedals, but decided not to provide the same instructions to U.S. dealers and government regulators. The NHTSA letter indicated that Toyota may have known about the UA defects for at least three years.

123. On April 19, 2010, Toyota agreed to pay the fine. That same day, NHTSA Secretary Ray LaHood released a statement saying, "By failing to report known safety problems as it is required to do under the law, Toyota put consumers at risk."

**F.   Toyota Executives' Successful Concealment of the Defects Described Internally as a "Win" for Toyota**

124. In May 5, 2009 Chris Santucci wrote an e-mail to Takeharu Nishida, a Toyota engineer, expressing pleasure that NHTSA would not ask Toyota to disclose all reports related to throttle issues in its pending investigation: "They [NHTSA] are struggling with sending an IR letter, because they shouldn't ask us about floor mat issues because the petitioner contends that NHTSA did not investigate throttle issues other than floor mat-related. So they should ask us for non-floor mat related reports, right? But they are concerned that if they ask for other reports, they will have many reports that just cannot be explained. And since they do not think that they can explain

them, they don't really want them. Does that make sense? I think it is good news for Toyota." (*See* Exhibit 12.)

125. Toyota took the same attitude toward the 2007 Floor Mat recall in a presentation dated July 6, 2009. Toyota's lead executive in American Operations, Yoshi Inaba, described as a "win" the fact that Toyota saved $100 million dollars by negotiating an "equipment" recall rather than some other alternative safety measure to address the sudden acceleration issue: "Wins for Toyota — Safety Group...Negotiated 'equipment' recall on Camry/ES re: SA, saved $100M+, w/ no defect found." Toyota knew that it had saved millions of dollars through concealing the known potential for UA in its vehicles.

**G. Toyota's Concealment of Unintended Acceleration Defects and Incidents to Avoid the "Global" Ramifications of Disclosure**

126. An internal PowerPoint reveals that Toyota knew about recurring issues with UA. A slide entitled, "Key Safety Issues" included the following:

- 'Sudden Acceleration' on ES/Camry, Tacoma, LS, etc.

- Recurring issue, PL/Design Implications. (*See* Exhibit 13.)

127. A September 2009 Toyota internal document demonstrates how "global ramifications," rather than safety dictated Toyota's position with respect to "vehicle defect:"

TMC on the other hand will most likely not easily budge from their position that there is no vehicle defect. Especially considering the global ramifications. In addition, since no one of any rank (VP or higher) at TMS has communicated the significance and impact of this issue, TMC may feel that we can weather an investigation and additional media coverage.

128. On January 16, 2010, Irving Miller, a Toyota Executive, admitted "we need to come clean" about acceleration problems: "I hate to break this to you but WE HAVE a tendency for MECHANICAL failure in accelerator

46

pedals of a certain manufacturer on certain models. We

are not protecting our customers by keeping this quiet.

The time to hide on this one is over. We need to come

clean and I believe that Jim Lentz and Yoshi are on the

way to DC for meetings with NHTSA to discuss options...We

better just hope that they can get NHTSA to work with us

in coming with a workable solution that does not put us

out of business." (See Exhibit 14.) Toyota knew about

this mechanical tendency for failure for years and still

has not properly disclosed it.

### H.   Toyota's Repeated Promises of Safety, Denial of the Defects, and Accusations Against Victims

129. In a June 19, 2004 letter to NHTSA, Toyota falsely

stated that its ETCS contained a built-in redundancy to

prevent acceleration, and that in the event of sudden

acceleration the "vehicle brakes would have restrained vehicle

motion." Toyota maintained this position for years, even

though it knew that Toyota manufactured vehicles can and do

experience sudden unintended acceleration and that application

of the brakes has failed to restrain vehicle motion.

130. Toyota consistently assured NHTSA and the public

that the subject vehicles were not defective. For instance, in

August 2005, NHTSA opened Defect Petition DP05-002 to

investigate a consumer's claims relating to unintended

acceleration in the 2002 Camry. Scott Yon again was assigned

as NHTSA's investigator. The target vehicle population was 1,950,577 Model Year 2002-2005 Camrys and Lexus ES models. After receiving the petition and reviewing the underlying complaints, Toyota concluded:

> [T]here is no factor or trend indicating that a vehicle or component defect exists. Toyota believes that this Defect petition to be similar to other, prior petitions and investigations into mechanical throttle controls. Toyota has found no evidence that differentiates that consumers alleging vehicles equipped with electronic throttle controls can suddenly accelerate when compared to those equipped with mechanical throttle controls. Toyota has not found any evidence on the subject vehicles of brake failure, let alone brake failure concurrent with ETC failure.

131. Throughout the relevant period, Toyota discounted its customer's experience with UA. For example, on September 22, 2005, Carol Hargrave of TMS' Customer Relations Department wrote the following in a letter to a concerned Lexus owner who had complained to Toyota about her experiences of unintended acceleration:

> "It is our understanding that you reported that you stepped on the brake pedal and the vehicle accelerated and that this has happened several other times. As you are aware your vehicle was inspected in regards

to your concerns with the brakes and unintended acceleration. Your concerns could not be duplicated. The throttle body was inspected and there was no binding and the cable operated freely. The vehicle was test driven and the brakes were functioning properly. There were no codes to indicate any type of failure of the system.

It is virtually impossible for this type of incident to happen. The brakes and the throttle are two totally separate systems and both would have to fail at exactly the same time. The brakes will always override the throttle."(Emphasis added.)

## TOLLING OF STATUTE OF LIMITATIONS AND ESTOPPEL

132. Plaintiffs filed this lawsuit within two years of the subject incident, and within two years of first suspecting that defects in the subject vehicle were a cause of Plaintiff's injuries and damages. Toyota is estopped from relying on any statutes of limitation because of its fraudulent concealment and misrepresentations of the true facts concerning the dangerously defective acceleration control and throttle system on the subject vehicles. Toyota was, at all relevant times, aware of the nature and existence of the defects in the subject vehicles, but at all times has continued to manufacture, certify, market, advertise,

distribute, and sell the subject vehicles without revealing the true facts concerning the defects, in order to sell Toyota and Lexus cars, to avoid bad publicity, and to avoid expensive recalls. The true facts about the subject vehicles continue to be concealed from the public, including Plaintiff.

133. Toyota's fraudulent concealment scheme discussed above, includes, but is not limited to, intentionally covering up and refusing to publicly disclose critical internal memoranda, design plans, studies, Notices of Action, Problem Detail Reports and other reports of failure and injury. Through such acts of fraudulent concealment, Toyota was able to actively conceal from the public for years the truth about the existence of the dangerously defective acceleration control and throttle system in the subject vehicles, thereby tolling the running of any applicable statute of limitations.

134. Through such acts of fraudulent concealment, Toyota has successfully concealed from the public facts necessary to support the claims herein. Plaintiffs were and continue to be prevented from knowing and having knowledge of such unlawful, unfair, fraudulent, and deceptive conduct, or of facts that might have led to the discovery thereof.

135. Particularly given Toyota's past and continuing denials of, and concealment of, the existence of any defect in the acceleration control and throttle system, and Toyota's

repeated past and continuing assertions that unintended acceleration episodes were due to other causes, Plaintiffs were not placed on inquiry notice regarding the defects in the acceleration control and throttle system until recently. In February 2010 Toyota stated publicly, in connection with Congressional hearings, that it does not, in fact, know the cause of the UA problem in the majority of cases (contrary to its repeated past claims about floor mats and sticking pedals). Toyota has continued to deny, and to conceal, that there is any flaw or defect in the acceleration control and throttle system itself. Toyota's April 19, 2010 agreement to pay NHTSA's $16.4 million fine constitutes an acknowledgement that Toyota engaged in a pattern and practice of concealing the true problems which resulted in unintended acceleration in its cars, the full extent of which will only become known through further governmental investigation and litigation.

136. For these same reasons, Defendants are estopped from claiming that Plaintiffs did not secure, preserve, maintain and/or otherwise continue to make available the subject vehicle for inspection by Defendants. Because Toyota actively and intentionally concealed the defects for years, Plaintiffs were never placed on notice that there was a need to preserve the subject vehicle. Due to the

accident and Toyota's pattern of concealment, Plaintiffs' ability to obtain evidentiary proof in the form of an intact, easily inspected vehicle has been rendered difficult, if not unattainable.

137. Sudden acceleration was among the defects for which this subject 2008 had been the subject of a recall following the 2008 model year.

138. Defendant Toyota directed its authorized dealers and agents to repair all documented recalls, and to submit bills to them for payment.

139. Once a repair was made, it was reasonably foreseeable to Defendant Toyota that other customers would purchase the vehicle for transportation.

140. As a result of the manufacture/distribution of a defective product that caused harm to the Plaintiff, Defendant Toyota Motor Sales, Inc. is strictly liable to the Plaintiff.

**FIRST COUNT**
**Negligence**

141. Plaintiff repeats and realleges the preceding paragraphs previously alleged herein.

142. At all times herein mentioned, Defendants designed, tested, manufactured, assembled, analyzed, recommended, merchandised, advertised, promoted, distributed, supplied, and

sold to distributors and retailers for sale, the subject vehicle and/or its component parts.

143. Defendants owed Plaintiffs a duty to exercise reasonable care in the design, testing, manufacture, assembly, sale, distribution and servicing of the subject vehicle, including a duty to ensure that the subject vehicle did not cause Plaintiffs, decedent, other users, bystanders, or the public, unnecessary injuries or deaths.

144. Defendants knew or should have known that the subject vehicle was defectively designed and inherently dangerous and has a propensity to suddenly accelerate, lose control, and cause injuries.

145. Defendants knew or should have known that the subject vehicle was defectively designed and/or manufactured and was therefore prone to failure under normal driving conditions, potentially causing injuries and/or deaths.

146. Defendants failed to exercise ordinary care and breached their duty by, among other things:

   a. Failure to use due care in the manufacture, distribution, design, sale, testing, and servicing of the subject vehicle and its component parts in order to avoid the aforementioned risks to individuals;

   b. Failure to provide adequate warning of the UA problem and its propensity to cause and/or contribute to an accident;

c. Failure to incorporate within the vehicle and its design reasonable safeguards and protections against sudden acceleration and the consequences thereof;

d. Failure to make timely correction to the design of the subject vehicle to correct the sudden acceleration problems;

e. Failure to adequately identify and mitigate the hazards associated with UA in accordance with good engineering practices; and, were otherwise careless or negligent.

147. The aforementioned negligent acts and omissions of Defendants were the direct and proximate cause of Plaintiff's accident and injures, including but not limited to pain and suffering, disability, loss of enjoyment of life, and permanency, and, as a result, Plaintiff is entitled to damages

WHEREFORE, Plaintiff Baila Segal demands judgment individually, joint and severally against the Toyota Defendants, John Does 1-5 and ABC Corporation 1-5 for compensatory damages, together with attorneys' fees, interest and costs of suit, and such further relief as the Court may deem equitable and just.

## COUNT TWO
### STRICT PRODUCT LIABILITY

148. Plaintiff repeats and realleges all of the preceding paragraphs previously alleged herein.

149. The Toyota Defendants designed, manufactured, assembled, and placed into the stream of commerce a product as

defined by the New Jersey Product Liability Act N.J.S.A. § 2A:58C-2 et seq. known as the 2008 Toyota Avalon that Plaintiff was operating at the time of her crash.

150. The design, manufacture, and/or assembly the 2008 Toyota Avalon was not reasonably fit, suitable or safe for its intended purpose:

a.  deviated from the design specifications, formulae, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulae; and/or

b.  failed to contain adequate warnings or instructions; and/or

c.  was designed in a defective manner.

151. As a result of placing a defective product in the stream of commerce, Plaintiff experienced an unintended acceleration of the vehicle thereby causing same to crash into multiple vehicles.

152. As a result of the crash, plaintiff was caused to sustain serious and permanent injuries, pain and suffering, emotional distress, loss of enjoyment of life, loss of bodily functions, loss of income, and out of pocket expenses, and otherwise significantly impacted her health and daily activities.

WHEREFORE, Plaintiff Baila Segal demands judgment individually, joint and severally against the Toyota Defendants,

John Does 1-5 and ABC Corporation 1-5 for damages, attorneys' fees, together with interest and costs of suit and for such further relief as the Court may deem equitable and just.

## COUNT THREE
## BREACH OF DUTY PROXIMATELY CAUSING DAMAGE

153. Plaintiff repeats and realleges the preceding paragraphs.

154. Defendant Toyota owed a duty to Plaintiff to prevent the foreseen damages, or a duty grounded in the natural responsibilities of societal living and human relationship recognized by reasonable persons.

155. Defendant Toyota breached that duty.

156. Defendant Toyota is liable to the other for the other's damages, including nominal damages.

157. Defendant proximately caused the damages.

WHEREFORE, Plaintiff Baila Segal demands judgment individually, joint and severally against the Toyota Defendants, John Does 1-5 and ABC Corporation 1-5 for compensatory damages, together with attorneys' fees, interest and costs of suit, and such further relief as the Court may deem equitable and just.

## COUNT FOUR
## CARELESS CONTRACTUAL WORK DAMAGE

158. Plaintiff repeats and realleges the preceding paragraphs.

159. The parties did not have an express contractual undertaking concerning workmanship.

160. Defendant Toyota failed to perform in a reasonably good and workmanlike, non-negligent manner.

161. Defendant Toyota is liable to Plaintiff for damages to the work flowing from a breach of that implied promise of reasonable workmanship.

162. Defendant Toyota is also liable to an assignee of rights for breach of contract, such as a successor in title without knowledge of the breach or without the ability to discover the breach upon reasonable inspection of the work before and at the time title was transferred.

WHEREFORE, Plaintiff Baila Segal demands judgment individually, joint and severally against the Toyota Defendants, John Does 1-5 and ABC Corporation 1-5 for compensatory damages, together with attorneys' fees, interest and costs of suit, and such further relief as the Court may deem equitable and just.

## COUNT FIVE
## CONSUMER FRAUD

163. Plaintiff repeats and realleges the preceding paragraphs.

164. Defendant Toyota used an unconscionable commercial practice, deception, fraud, false pretense, false promise, or misrepresentation, in connection with the sale, rental, distribution, repair or advertisement of merchandise, whether before or subsequent to the sale, distribution or advertisement.

165. Defendant Toyota knowingly concealed, suppressed, or omitted a material fact or facts with the intent that others, such as the Plaintiff rely, in connection with the sale, distribution, repair or advertisement of merchandise, whether before or subsequent to the sale, distribution, or advertisement.

166. Defendant Toyota violated specific regulations promulgated under the Consumer Fraud Act, NJSA 56:8-1 et seq.

167. Defendant Toyota violated the new motor vehicle warranties specifically NJSA 56:12-34, NJSA 56:12-35, and NJSA 56:12-44.

168. Defendant Toyota violated the Consumer Fraud Act concerning the sale and warranty of certain used motor vehicles, specifically NJSA 56:8-68 or NJSA 56:8-69.

169. Defendant Toyota is liable to the consumer for attorney's fees and costs.

170. Defendant Toyota is liable to the consumer for any ascertainable loss, including compensation for permanent personal injuries as a result of the unlawful consumer fraud, for treble damages, and any other appropriate legal or equitable relief.

171. Defendant Toyota is liable for a refund of all moneys acquired by means of the unlawful consumer fraud.

WHEREFORE, Plaintiff Baila Segal demands judgment individually, joint and severally against the Toyota Defendants, John Does 1-5 and ABC Corporation 1-5 for compensatory damages, treble damages, together with attorneys' fees, interest and costs of suit, and such further relief as the Court may deem equitable and just.

## COUNT SIX
### RECOUPMENT FOR CONTRACT BREACH HARMING OUTSIDER

172. Plaintiff repeats and realleges the preceding paragraphs.

173. Defendant Toyota breached their contract in a manner that precipitated a third party claim against the non-breaching party.

174. Defendant Toyota is liable to the non-breaching party for any Judgment or reasonable settlement to the third party, including costs or attorneys' fees.

175. It was reasonable and foreseeable for Defendant Toyota to have foreseen at the time of contract formation the likelihood that breach would result in a third party claim.

WHEREFORE, Plaintiff Baila Segal demands judgment individually, joint and severally against the Toyota Defendants, John Does 1-5 and ABC Corporation 1-5 for compensatory damages, together with attorneys' fees, interest and costs of suit, and such further relief as the Court may deem equitable and just.

**COUNT SEVEN**
**CONCEALMENT OF DESTRUCTION OF EVIDENCE**
**INTENTIONAL CONCEALMENT OF EVIDENCE**
**SPOILATION OF EVIDENCE**

176. Plaintiff repeats and realleges the preceding paragraphs.

177. Defendant Toyota had a legal obligation to disclose and preserve evidence in connection with an existing or pending litigation.

178. Defendant Toyota intentionally withheld, altered, or destroyed material evidence with the purpose to disrupt potential litigation arising from a crash that occurred after recall "repairs".

179. Defendant Toyota is liable to Plaintiff for damages to the underlying action caused by having to rely on an evidential record that did not contain the concealed evidence, costs or

expenses in the litigation that would not otherwise have been incurred, and, if appropriate, punitive damages.

WHEREFORE, Plaintiff Baila Segal demands judgment individually, joint and severally against the Toyota Defendants, John Does 1-5 and ABC Corporation 1-5 for compensatory damages, punitive damages, together with attorneys' fees, interest and costs of suit, and such further relief as the Court may deem equitable and just.

## COUNT EIGHT
### EVIDENCE CONCEALED OR DESTROYED NEGLIGENTLY

180. Plaintiff repeats and realleges the preceding paragraphs.

181. Defendant Toyota negligently destroying or concealing evidence, knowing that litigation exists or is probable, is liable for damages, proximately caused by the spoliator's acts.

182. Defendant Toyota was disruptive to a claim or potential claim of the Plaintiff by acting as the spoliator with a design to disrupt Plaintiff's case.

183. Defendant Toyota hired an expert engineer whose work product reflects common knowledge that it would be used in a lawsuit.

184. Defendant Toyota voluntarily undertook to have that evidence and Plaintiff so reasonably and detrimentally relies thereon, or Defendant agrees to preserve the evidence, or

Defendant is specifically requested to preserve a particular item of evidence.

185. Defendant Toyota's negligent loss or destruction of that evidence resulted in damages to the Plaintiff and otherwise unnecessarily frustrated the Plaintiff's claim for damages against the Toyota Defendants.

WHEREFORE, Plaintiff Baila Segal demands judgment individually, joint and severally against the Toyota Defendants, John Does 1-5 and ABC Corporation 1-5 for compensatory damages, together with attorneys' fees, interest and costs of suit, and such further relief as the Court may deem equitable and just.

## COUNT NINE
## NEGLIGENT INSPECTION OR REPAIR OF AUTO CAUSING DAMAGE

186. Plaintiff repeats and realleges the preceding paragraphs.

187. Defendant Toyota inspected and repaired an automobile subject to Toyota's request.

188. Defendant Toyota by failing to exercise reasonable care not to cause bodily harm or damage to one whose person or property may reasonably be expected to be endangered by the probable use of the car after the inspection and making of the repair.

189. Defendant Toyota is liable to anyone for damages proximately caused by the inspector or repair person's negligence, including the plaintiff herein.

WHEREFORE, Plaintiff Baila Segal demands judgment individually, joint and severally against the Toyota Defendants, John Does 1-5 and ABC Corporation 1-5 for compensatory damages, together with attorneys' fees, interest and costs of suit, and such further relief as the Court may deem equitable and just.

**COUNT TEN**
**PROMISE CAUSING DESTRUCTION RELIANCE**

190. Plaintiff repeats and realleges the preceding paragraphs.

191. Defendant Toyota made a clear and definite promise regarding warranty repairs.

192. Defendant Toyota should reasonably expect that another will rely on the promise and will be bound by the promise.

193. Defendant Toyota should expect to incur liability for the damages proximately caused.

194. Defendant Toyota made a reasonably reliable promise to persons regarding the basis for recall repairs and cure effected thereby.

195. Plaintiff suffered harm of a definite and substantial nature, including permanent personal injuries.

WHEREFORE, Plaintiff Baila Segal demands judgment individually, joint and severally against the Toyota Defendants, John Does 1-5 and ABC Corporation 1-5 for compensatory damages,

together with attorneys' fees, interest and costs of suit, and
such further relief as the Court may deem equitable and just.

## COUNT ELEVEN
### BREACH OF EXPRESS AND IMPLIED WARRANTY OF MARCHANTIBILITY

196. Plaintiff incorporates by reference and realleges all
paragraphs previously alleged herein.

197. Prior to the time of the subject incident, the
Defendants impliedly warranted to members of the general public,
including Plaintiff, that the subject vehicle was of
merchantable quality.

198. Members of the consuming public, including consumers
such as Plaintiff were intended third-party beneficiaries of
the implied warranty of merchantability.

199. Plaintiff relied on the skill and judgment of
Defendants in the selection and use of the subject vehicle as a
safe and reliable means for transportation.

200. The subject vehicle was not of merchantable quality
as warranted by Defendants, in that it was defectively
designed, thereby dangerously exposing the users of said
vehicle and those around it to serious injury.

WHEREFORE Plaintiff Baila Segal demands judgment
individually, joint and severally against the Toyota Defendants,
John Does 1-5 and ABC Corporation 1-5 for compensatory damages,
together with attorneys' fees, interest and costs of suit, and
such further relief as the Court may deem equitable and just.

## DESIGNATION OF TRIAL COUNSEL

BRIAN MCALINDIN, ESQ. is hereby designated as trial counsel of behalf of the Plaintiff in the within matter.

## JURY DEMAND

Plaintiff hereby demands a trial by Jury as to all issues raised herein.

**BATHGATE, WEGENER & WOLF, PC**
Attorneys for Plaintiff Baila Segal

BY: _____
    BRIAN W. MCALINDIN. ESQ.
    *Attorney Identification No.:BWM3978*
**BATHGATE, WEGENER & WOLF, PC**
**1 Airport Road**
**Lakewood, New Jersey 08701**
**(732) 600-7988**

Dated:   January 21, 2020

EXHIBITS

Subject: Important Information: America ES350 article...addition #2
From: Koji_Sakakibara@toyota.com
Date: Tue, 1 Sep 2009 18:18:01 -0700
To: yoshioka@mail.tea.toyota.co.jp, Shunsuke Nozuchi <syun@nano.tec.toyota.co.jp>, nkitaura@mailtcn.toyota.co.jp, Kato    kako@smal.tec.toyota.co.jp>
CC: Kato          <mkatoh@mail.tae.toyota.co.jp>, Hirokazu_Sakamoto@toyota.com, Koji_Takara@toyota.com, Keiichi_Fukushima@toyota.com, washino@mailtcc.toyota.co.jp, yamaguch@earth.tec.toyota.co.jp,
r-kawamu@earth.ten.toyota.co.jp, y-yamai@emailtcn.toyota.co.jp, Kasanza    kanamori@earth.tec.toyota.co.jp>, ssakamt@earth.tea.toyota.co.jp, yoji@gise.tea.toyota.co.jp

To all concerned staff,
Thank you for your continued business. I am Sakakibara from TEC-2Gr, CQE-LA.
- The following information has been received from TMS-PQSS Public Affairs Group regarding the above (America ES350 article...addition #2). (Please see photos at the bottom of this mail.)
Within America, there are 196 articles on Google News, so the mass media is interested.
- During the floor mat sticking issue of 2007, TMS suggested that there should be "a fail safe option similar to that used by other companies to prevent unintended acceleration". I remember being told by the accelerator
pedal section Project General Manager at the time (Mr. M) that "This kind of system will be investigated by Toyota, not by Body Engineering Div". Also, that information concerning the sequential inclusion of a fail safe
system would be given by Toyota to NHTSA when Toyota was invited in 2008. (The NHTSA knows that Audi has adopted a system that closes the throttle when the brakes are applied and that GM will also introduce such a
system.)
==>In light of the information that "2 minutes before the crash an occupant made a call to 911 stating that the accelerator pedal was stuck and the vehicle would not stop", I think that Body Engineering Div. should act
proactively first (investigate issues such as whether the accelerator assy structure is the cause, how to secure the floor mats, the timing for introducing shape improvements).
- Furthermore, taking into account the circumstances that "in this event a police officer and his entire family including his child died", TMS-PQSS Public Affairs Group thinks that "the NHTSA and the USA public already hold
very harsh opinions in regards to Toyota". (As I think you know, in some cases in the USA "killing a police officer means the death penalty".)
- In light of the above, it would not be an exaggeration to say that even more than the nuance of the information passed from Customer Quality Engineering Div, External Relations Dept. to Body Engineering Div, " the
NHTSA is furious over Toyota's handling of things, including the previous Tacoma and ES issues".
Considering the importance of this matter, any correspondence regarding this issue including the reply from Body Engineering, no matter how small, must be sent to the Customer Quality Engineering Div, General Manager
and the Customer Quality Engineering Div, External Relations Dept. General Manager. (If possible, please exchange information with the Customer Quality Engineering Div. rather than replying to me.)

If you have any question, please feel free to contact me.

Thank you for your support and cooperation.

Sincerely yours,
K. Sakakibara

Note : Please do not disclose the message above to 3rd parties as it would contain some confidential items.

*****************************************************
Koji Sakakibara  榊原 幸二
Manager
TEMA CQE-LA Technical Group #2
19001 South Western Avenue.  Mail Drop S-305
Torrance, CA  90501-1104
Phone : 310-458-6078
Fax : 310-468-8181
Cell : 310-292-8552
E-Mail: koji_sakakibara@toyota.com
*****************************************************
----- Forwarded by Koji Sakakibara/TEMA/Toyota on 01/91/2009 02:47 PM -----
George Marine/TMS/Toyota

09/01/2009 12:30 PM

| To | Koji Sakakibara/TEMA/Toyota@Toyota |
| cc | |
| Subject | ES 350 News Story... |

Sakakibara-san:

You may have already heard about this, but FYI...

http://www2.nlpenssndaes.com/stories/2009/sep/01/summary-stories-fatal-car-crash/

196 news articles on a google news search...

EXHIBIT 1



EXHIBIT 1



A 911 call made minutes before the accident said the car's accelerator was stuck

By RORY DEVINE, MARI PAYTON and R. STICKNEY
Updated 11:41 AM PDT, Tue Sep 1, 2009

**A 911 call made minutes before the accident said the car's accelerator was stuck**

Four people died Friday when a Lexus sedan lost control on the highway, crashed near Mission Gorge Road in Santee and burst into flames.

The victims include veteran CHP officer Mark Saylor, 45, his wife Cleofe Lastrella Saylor, 45, his brother-in-law Chris Lastrella, 38, and his daughter Mahala, 13.

CHP investigators said they received a 911 call before 7 p.m. August 28 Cleofe Saylor saying their car's accelerator was stuck.

Witnesses reported seeing a Lexus heading northbound on 125 weaving through traffic at a high rate of speed. CHP officials said the driver tried to make a left turn when the freeway ended at Mission Gorge Road, but he was going too fast and struck a Ford Explorer.

George Marino
National Manager
Quality Compliance Department
Product Quality and Service Support
Toyota Motor Sales, U.S.A., Inc.
Tel  310-468-3392
Fax 310-468-3359

NOTICE: This email message and all attachments transmitted with it are intended solely for the use of the addressee and may contain legally privileged and confidential information. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, copying, or other use of this message or its attachments is strictly prohibited.

If you have received this message in error, please notify the sender immediately by email reply and please delete this message from your computer.  Thank you.

EXHIBIT 1

| | |
|---|---|
| From: | Wayne Hutchinson/=TMS/Toyota | Sent:2/2/2010 3:59 PM |
| To: [ - ] | ADP_Boston_Service; ADP_CAT_Service; ADP_Los_Angeles_Service; ADP_San_Francisco_Service; ADP_Portland_Service; ADP_Denver_Service; ADP_New_York_Service; ADP_Chicago_Service; ADP_Cincinnati_Service; ADP_Kansas_City_Service; Betty Tooson/=Lexus/Toyota@Toyota | |
| Cc: [ - ] | | |
| Bcc: [ - ] | George Morino/=TMS/Toyota | |
| Subject: | Safety Recall (Special Service Campaign) - 90L Phase 1 Certain 2007 – 2010 Model Year Camry and Camry Hybrid Vehicles Potential Floor Mat Interference with Accelerator Pedal Vehicles Equipped with Accelerator Pedals Manufactured by Denso Corporation (SM) | |

Toyota will initiate phase 1 of Safety Recall 90L - Certain 2007 - 2010 model year Camry and Camry Hybrid Vehicles - Potential Floor Mat Interference with Accelerator Pedal - Vehicles Equipped with Accelerator Pedal Manufactured by Denso Corporation.

Condition
As communicated last Fall, the defect is the potential for an unsecured or incompatible driver's floor mat to interfere with the accelerator pedal and cause it to get stuck in the wide open position. A stuck open accelerator pedal may result in very high vehicle speeds and make it difficult to stop the vehicle, which could cause a crash, serious injury or death. Toyota has determined that this defect does not exist in vehicles in which the driver's side floor mat is compatible with the vehicle and properly secured.

Remedy:
To make it less likely that an unsecured or incompatible driver's floor mat can interfere with the accelerator pedal, dealerships will be requested to do the following:
Modify both the rigid plastic accelerator pedal and the floor surface in the driver's foot-well. (On February 1, 2010, a dealer kit containing an accelerator template and gauge, an orbital sander and a reciprocating saw will be sent to each dealer via overnight air. The campaign tool kit will be marked with a florescent (green, orange, yellow, pink) label.)
If the vehicle is equipped with a set of optional genuine Toyota All Weather Floor Mats (AWFM), it must be inspected to determine if the AWFM set is of an older design. If it is, the older design AWFMs for the driver and the front seat passenger positions will be replaced with newly designed mats.
As an additional measure independent of the vehicle-based recall remedy, a newly designed override system will be installed on non-hybrid Camry vehicles to provide an extra measure of confidence. This system will cut engine power in case of simultaneous application of both accelerator and brake pedals at certain speeds and driving conditions. The Camry Hybrid already contains a fuel supply cut feature for Hybrid motor protection that achieves a similar result as the override system newly designed for the non-hybrid models.

Involved Vehicles:
There are approximately 787,000* Toyota 2007 – 2010 model year Camry and Camry Hybrid vehicles involved in the U.S.
The following SSC 90L Summary Reports will be provided shortly:
The number of involved vehicles in your dealership's primary marketing area for this phase.
The suggested initial parts order quantities for this phase.
A VIN List containing vehicles in dealer stock.
*NOTE: Due to the number of vehicles involved in the first phase of this campaign, the VINs will be loaded into TIS and the Warranty System in 2 groups over two days. Group 1 will include all affected Camry and Camry Hybrid vehicles produced up to December 31, 2009. Group 2 will include all affected Camry and Camry Hybrid vehicles produced from January 1, 2010, to the production change.

Please refer to the attached Region-PD Notification for additional information.

(We are currently working on several different SSCs and ask for your patience in allowing a few extra days for hard copies to arrive at each Dealer.)

[Dealer Notification, Owner Letter and TI]


[Dealer Daily Message]


(Q&A will be provided shortly. We apologize for the inconvenience.)

EXHIBIT 2

Owner Notification
Owner notifications will begin in mid-February, 2010.


Thank you for your continued support,


Product Quality and Service Support
Toyota Motor Sales, U.S.A., Inc.


NOTICE: This email message and all attachments transmitted with it are intended solely for the use of the addressee and may contain legally privileged and confidential information. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, copying, or other use of this message or its attachments is strictly prohibited.

If you have received this message in error, please notify the sender immediately by email reply and please delete this message from your computer. Thank you.

EXHIBIT 2

| | |
|---|---|
| **From:** | Yon, Scott |
| **Sent:** | Thursday, June 03, 2004 9:15 AM |
| **To:** | Chris Santucci |
| **Subject:** | For review |
| **Categories:** | PE04021-ToyotaThrottleControl |
| **Attachments:** | CamryVSCTrend-200402.pdf |

See attached. Give me a call when you have time; I want to discuss the submission and the attached.

Scott


D. Scott Yon
U.S. Department of Transportation
National Highway Traffic Safety Administration
Office of Defects Investigation

400 7th Street S.W.
Washington, DC
20590

---------------------------------------
The information contained in this e-mail message has been sent from a federal agency.  It may be
privileged, confidential, and/or protected from disclosure. If you are not the intended recipient, any
further disclosure or use, dissemination, distribution, or copying this message or any attachment is
strictly prohibited.  If you think that you have received this e-mail message in error, please delete it and
notify the sender.
===============================================

2/21/2010                                    EXHIBIT 3



EXHIBIT 3

| From: | Mark Johnson/=WDC/Toyota_NY | Sent: 10/19/2007 12:15 PM |
|---|---|---|
| To: [ - ] | Christopher Tinto/=WDC/Toyota_NY@Toyota_NY | |
| Cc: [ - ] | Chris Santucci/=WDC/Toyota_NY@Toyota_NY | |
| Bcc: [ - ] | | |
| Subject: | Re: URGENT Fw: Committee Letter | |

Great. I will draft it on Monday

From: Christopher Tinto
Sent: 10/19/2007 03:00 PM
To: Mark Johnson
Cc: Chris Santucci
Subject: Re: URGENT Fw: Committee Letter

I think if we couple it with the attached TMS Q&A it can work. Basically, its all we know right now.

1) We are aware of it
2) We are looking into it
3) NHTSA is investigating, and NHTSA is testing, NHTSA has sent us a letter
4) This 'sounds' like sudden accel, which NHTSA has found time and time again typically is pedal misap (we wont say this overtly, as to not blame consumers) - but one big problem is that no codes are thrown in the ECU, so the alleged failure (as far as we know) can not be documented or replicated. The service tech therefore cant 'fix' anything, and has no evidence that any problem exists.
5) It is too soon to tell what is going on here.

After you chew on it a bit, lets regroup and see what holes we need to fill in...

THANKS SIR

Best Regards,
Chris

Chris Tinto
*******************************************
Vice President, Technical and Regulatory Affairs, Safety
Toyota Motor North America, Inc.
601 13th St. NW
Suite 910 South
Washington, DC 20005
Phone (202) 463-6824
NEW CELL NUMBER - (202) 412-7822
email: Chris_Tinto@tma.toyota.com

Mark Johnson/WDC/Toyota_NY
10/19/2007 02:52 PM
To Christopher Tinto/WDC/Toyota_NY@Toyota_NY
cc
Subject Re: URGENT Fw: Committee Letter

EXHIBIT 4

Works for my purposes. But - does it get enough of our message out for your purposes if she releases this to the media or do you think we need more info?


----- Original Message -----
From: Christopher Tinto
Sent: 10/19/2007 02:36 PM
To: Chris Santucci
Cc: Christopher Tinto; Jo Cooper; Kevin Ro; Mark Johnson
Subject: Re: URGENT Fw: Committee Letter

Chris :

Thanks for this very quick response - I appreciate it.

Mark - will this work for your purposes? Can you draft something to go back to your folks on the Hill if/when needed?


Best Regards,
Chris



Chris Tinto
*******************************************
Vice President, Technical and Regulatory Affairs, Safety
Toyota Motor North America, Inc.
601 13th St. NW
Suite 910 South
Washington, DC 20005
Phone (202) 463-6824
NEW CELL NUMBER - (202) 412-7822
email: Chris_Tinto@tma.toyota.com




Chris Santucci/WDC/Toyota_NY
10/19/2007 02:14 PM
To Christopher Tinto/WDC/Toyota_NY@Toyota_NY
cc Chris_Tinto@tma.toyota.com, Jo Cooper/WDC/Toyota_NY@Toyota_NY, Kevin
Ro/WDC/Toyota_NY@Toyota_NY, Mark Johnson
Subject Re: URGENT Fw: Committee Letter




Chris,

Attached is the Q&A dated October 3 from TMS on this issue. Since the time this Q&A was approved by TMS, I contacted NHTSA and obtained 19 owner complaint reports from NHTSA on the Tacoma. The complaint reports mention engine surge and vehicle lurch, etc. There are some low speed crashes alleged. TMC and TMS are looking into them as we speak.

NHTSA has been reviewing the complaints in their own database, as well as some owner forums on the internet. They have not opened a defect investigation. The Office of Defects Investigation (ODI) did ask the Office of Vehicle Safety Compliance (OVSC) to confirm the compliance of the 2007 MY Tacoma with FMVSS 124, as you noted. As

EXHIBIT 4

such, NHTSA issued a standard compliance IR (Information Request) to us on September 26, which I just received a draft response this morning from TMC-QD. Our response is due October 23. I also spoke with Harry Thompson at OVSC (he's the responsible branch chief) about this letter and they have purchased a vehicle (a 2WD V6) that will be tested at VRTC after we respond to the IR. TMS is aware of the issue and media inquiries can be directed to Corporate Communications if needed.
[attachment "2007 Tacoma Throttle Control System Q&A 10-03-07 v3.doc" deleted by Mark Johnson/WDC/Toyota_NY]

Regards,

Chris Santucci - Assistant Manager
Technical and Regulatory Affairs
Toyota Motor North America, Inc.
Ofc (202) 463-6856 Cell (202) 651-1581 Fax (202) 463-8513
email: Chris_Santucci@tma.toyota.com

Note: We cannot receive attachment extensions listed below.
.exe, .com, .pif, .scr, .cmd, .bat, .vbs, .lnk, .htm, .html, .shs, or .zip


Christopher Tinto/WDC/Toyota_NY
10/19/2007 01:45 PM
To chris santucci
cc Kevin Ro/WDC/Toyota_NY@Toyota_NY, Chris_Tinto@tma.toyota.com, Mark Johnson, jo cooper
Subject URGENT Fw: Committee Letter


Chris :

See below. Please give me a one paragraph write up on what is going on for this issue with NHTSA. (i.e. what the complaint/allegation is, note that NHTSA is doing a compliance investigation into 124 , note that we got a letter and are cooperating, NHTSA bought a truck, TMC is looking into it, etc. Whatever you can think of, please add it...

Also, was there a Q&A on this issue out of TMS?

Mark will write a letter up for the committee to try to stop this from moving forward - We need to keep this within NHTSA rather than have it expand to a hearing.

Thanks - I need this NO LATER than Monday 12:00 OK?


Best Regards,
Chris


Chris Tinto
**********************************************
Vice President, Technical and Regulatory Affairs, Safety
Toyota Motor North America, Inc.
601 13th St. NW
Suite 910 South
Washington, DC 20005
Phone (202) 463-6824
NEW CELL NUMBER - (202) 412-7822
email: Chris_Tinto@tma.toyota.com



EXHIBIT 4

----- Forwarded by Christopher Tinto/WDC/Toyota_NY on 10/19/2007 01:40 PM -----

Mark Johnson/WDC/Toyota_NY
10/19/2007 10:55 AM
To ctinto@tma.toyota.com
cc Jo Cooper/WDC/Toyota_NY@Toyota_NY, Anna Schneider/WDC/Toyota_NY, Charlie Ing/WDC/Toyota_NY
Subject Fw: Committee Letter

Chris, I got a heads up from a friend of mine in Rep. Blackburn's office about a letter his boss sent to the Energy and Commerce Committee asking for an investigation into sudden acceleration on the 2007 Tacoma. Apparently, a local news station in Nashville (see the links below) has been doing a story on this and interviewed Rep. Blackburn and asked her about the issue. She was on the spot and said she would look into it, thus the attached letter. Do you have any information I can provide her or any recommendations on how to proceed?

Thanks,

Mark
----- Forwarded by Mark Johnson/WDC/Toyota_NY on 10/19/2007 10:50 AM -----
"Louer, Greg" <Greg.Louer@mail.house.gov>
10/19/2007 10:19 AM

To <mark_johnson@tma.toyota.com>
cc "Brophy, Steve" <Steve.Brophy@mail.house.gov>
Subject Committee Letter

Mark,

Thanks for taking the call this morning, and if you have any questions just let me know.

Best regards,

- Greg L.

http://www.wsmv.com/iteam/14295351/detail.html

http://www.wsmv.com/iteam/14304072/detail.html

Greg Louer
Office of Rep. Marsha Blackburn
509 Cannon House Office Building
202-225-2811 (Voice)
202-225-3004 (Fax)
greg.louer@mail.house.gov
[attachment "10-18-2007_Letter_Toyota Safety Issue_version two.doc" deleted by Mark Johnson/WDC/Toyota_NY]

EXHIBIT 4

| From: | Chris Santucci/=WDC/Toyota_NY. | Sent:9/18/2006 1:26 PM. |
|---|---|---|
| To: [ - ] | Michiteru Kato/=HINPO/TMC0@TMC0. | |
| Cc: [ - ] | Tetsuya Ito/=HINPO/TMC0@TMC0;Christopher Tinto/=WDC/Toyota_NY@Toyota_NY;Kevin Ro/=WDC/Toyota_NY@Toyota_NY,Kenji Ogata/=WDC/Toyota_NY@Toyota_NY | |
| Bcc: [ ] | George Molino/=TMS/Toyota. | |
| Subject: | Defect Petition - Camry/Solara Engine Surge. | |

Mitch,

I spoke with the investigator about the DP. It sounds like the he will only follow up with the petitioner, probably visit him and check the vehicle. The petitioner told him that at one point the vehicle surged to 3000 rpms with it in gear, stopped, and with his foot on the brake. I believe this is impossible given the stall speed of the torque converter, and the investigator agreed that this was probably incorrect. Anyway, he will probably not ask us for any data on this one, but he promised to send us the VIN of the petitioner's vehicle. More to follow.

Regards,

Chris Santucci - Safety Engineer
Technical and Regulatory Affairs
Toyota Motor North America, Inc.
Phone (202) 463-6856 Fax: (202) 463-8513
email: Chris_Santucci@tma.toyota.com

_____

Mitch,

Today TMA received a fax from NHTSA informing us that they have agreed to consider a petition to open a defect petition on the 2002-2006 Toyota Camry and Solara for engine surge. Attached is a copy of the petition. While NHTSA has investigated these vehicles before, (see PE04-021) TMA demonstrated the maximum surge that could be caused by the electronic throttle control system during operation. I was under the impression that NHTSA realized that, even in the worst case, surge was minimal and always controllable by the brakes. I will speak with NHTSA on Monday to gather their impressions. Hopefully, this is just an exercise that NHTSA needs to go through to meet its obligations to the petitioner. Hopefully, they will not grant the petition and open another investigation. More details to follow...

Regards,

Chris Santucci - Safety Engineer
Technical and Regulatory Affairs
Toyota Motor North America, Inc.
Phone (202) 463-6856 Fax: (202) 463-8513
email: Chris_Santucci@tma.toyota.com

EXHIBIT 5

| From: | Christopher Tinto/=WDC/Toyota_NY | Sent:2/27/2007 6:06 AM |
|---|---|---|
| To: [ - ] | chris santucci | |
| Cc: [ - ] | | |
| Bcc: [ - ] | | |
| Subject: | Re: Demonstration | |

Hey - when you get time to nail it down - please fill me in on the demo plans (location, etc.) + any plans with Mitch...

Thanks
Chris


Chris Tinto
************************************
Vice President, Technical and Regulatory Affairs, Safety
Toyota Motor North America, Inc.
601 13th St. NW
Suite 910 South
Washington, DC 20005
Phone (202) 463-6824 Fax: (202) 463-8513
email: Chris_Tinto@tma.toyota.com



Michiteru Kato/HINPO/TMC0@TMC0
02/27/2007 07:27 AM
To Chris Santucci/WDC/Toyota_NY@TOYOTA_NY@TOYOTA_NY, Kevin Ro/WDC/Toyota_NY@TOYOTA_NY, Hisaaki
cc Christopher Tinto/WDC/Toyota_NY@TOYOTA_NY, Kevin Ro/WDC/Toyota_NY@TOYOTA_NY, Hisaaki
Kato/WDC/Toyota_NY@Toyota_NY@TOYOTA@TMCE, Hajime Kitamura/HINPO/TMC0@TMC0, Shinichiro
Ogata/HINPO/TMC0@TMC0, Takezo Oba/HINPO/TMC0@TMC0, Seiko Takeuchi/HINPO/TMC0@TMC0
Subject Re: Demonstration



Chris,

Thank you for fixing the date for the demonstration. I talked to the travel agency today and asked her to finalize my trip to DC(flight and hotel). As planed, I will leave Japan on 3/4(Sun) and arrive in DC on the same day, and leave DC on 3/9(Thu).
I will bring an engineer of a design department, who knows EPS system well, for the demonstration and technical meeting. His name is Mr. Iwasaki. I think he may speak English well because he has been in the U.S. for 2 or 3 years to get a master degree 10 years ago.
I wondered whether it's better to ask another engineer, who is in charge of the EPS ECU, to attend the meeting, because he knows the ECU failures well. However, I thought that 3 guys from TMC is too many (two at most), and if the engineer who knows the failures well attends the meeting, NHTSA will ask a bunch of questions about the ECU.(I want to avoid such situation.) Also considering the purpose of the technical meeting and demonstration, I think the EPS system engineer is the best to attend it this time.

Currently Mr. Iwasaki is preparing the technical presentation material, which includes the explanation of the outline of the EPS system(each related component) and the each fail-safe mode. Probably I will be able to sent that material to you for your advance review by Thursday. Let's discuss the detail of the contents in the pre-meeting and modify it if necessary.

And as I told you, I sent you a sample of the EPS ECU, special ECU and three samples of the EPS motor shaft by FedEx today and they will reach you in the morning of Wednesday. Please treat the special ECU carefully. Do not drop/disassemble it. Please have it sit in your cabinet. In addition, if you touch the motor shaft by naked hands, there

EXHIBIT 6

is a possibility that the shaft may corrode, because the shafts do not have an anticorrosive treatment.

If you have any concerns, let me know.

Best regards,

Mitch

宛先: Michiteru Kato/HINPO/TMC0@TMC0@TMCE@TOYOTA
cc:
件名: Re: Demonstration

Fixed for March 7.

I am looking for an area to test.

Regards,

Chris Santucci - Assistant Manager
Technical and Regulatory Affairs
Toyota Motor North America, Inc.
Ofc (202) 463-6856 Cell (202) 651-1581 Fax (202) 463-8513
email: Chris_Santucci@tma.toyota.com

Note: We cannot receive attachment extensions listed below.
.exe, .com, .pif, .scr, .cmd, .bat, .vbs, .lnk, .htm, .html, .shs, or .zip

EXHIBIT 6

| From: | Christopher Tinto/=WDC/Toyota_NY, | Sent:3/28/2007 10:17 AM. |
|---|---|---|
| To: [~] | Michiteru Kato/=HINPO/TMC0@TMC0@TMCE@TOYOTA. | |
| Cc: [~] | Shinichiro Ogata/=HINPO/TMC0@TMC0;Takezo Oba/=HINPO/TMC0@TMC0;George Morino/=TMS/Toyota@TOYOTA;chris santucci;Kevin Ro/=WDC/Toyota_NY@Toyota_NY;Hisaaki Kato=WDC/Toyota_NY@Toyota_NY. | |
| Bcc: [~] | Jim Press/=Exec/=TMS/Toyota@TOYOTA;jo cooper;anna_schneider@tma.toyota.com. | |
| Subject | URGENT*****ES350 ISSUE*********** | |

Further to my earlier email, I spoke to Demeter about our proposal. As I noted, they have decided to open a PE on the floor mat issue, regardless of whether we send a letter or not.

Although I noted that our proposal was basically a 'recall', and that a PE would result in little else as far as what Toyota could do, Demeter noted that the reasons for opening were as follows:

NHTSA feels that they have too many complaints on this one vehicle to drop the issue;
The results of a stuck throttle are 'catastrophic';
And therefore, they want to ask Toyota for its data on complaints, etc.,
NHTSA may also go out with its own "owner survey" or "dealer survey" to try to get a better feel for the magnitude of the problem.

Nonetheless, I would recommend that we go ahead with the letter mailing campaign as planned and get in front of this issue.

Please let us know if we have any questions.

Best Regards,
Chris


Chris Tinto
*************************************
Vice President, Technical and Regulatory Affairs, Safety
Toyota Motor North America, Inc.
601 13th St. NW
Suite 910 South
Washington, DC 20005
Phone (202) 463-6824 Fax: (202) 463-8513
email: Chris_Tinto@tma.toyota.com


----- Forwarded by Christopher Tinto/WDC/Toyota_NY on 03/28/2007 11:44 AM -----

Christopher Tinto/WDC/Toyota_NY
03/27/2007 02:24 PM
To Mitch Kato
cc Shinichiro Ogata/HINPO/TMC0@TMC0, Takezo Oba/HINPO/TMC0@TMC0, George Morino/TMS/Toyota@TOYOTA, chris santucci, Kevin Ro/WDC/Toyota_NY@Toyota_NY, Hisaaki Kato/WDC/Toyota_NY@Toyota_NY
Subject Fw: URGENT*****ES350 ISSUE***********


I spoke to NHTSA management today (K. Demeter) about a potential compromise on the ES350 floor mat issue.
In lieu of a Part 573 safety recall, I offered the following:
Toyota will send a letter to all 2007MY ES350 owners reminding them not to install all weather mats on top of existing mats;
In addition, we will enclose a caution label advising owners of the same, and ask owners to affix the label on the flat surface on the backside of the mat;
We will also alert dealers of the issue, and remind them not to install mats on top of existing mats;

EXHIBIT 7

If the owners want to have the dealer affix the label to the mat, Toyota will offer that they bring their vehicles to the dealer to ask them to do it, free of charge.
However, we will NOT file a 573 (i.e. this is not a safety recall), because a) this is an 'aftermarket' install b) there is no design or manufacturing defect in the mat or vehicle, and c) the issue really boils down to improper installation of the mats by the owner or the dealer (but I noted that Toyota has no evidence that dealers are actually doing this.)

Ms. Demeter said that there is precedent in NHTSA's history for safety recalls in this area, but understood our idea - she pledged that they would discuss it internally and get back to me with a response to our proposal in a few days. She also insured me that NHTSA would not open a formal PE until she gets back to me.

I will keep everyone informed.

Regards,
Chris

EXHIBIT 7

| From: | George Morino/=TMS/Toyota | Sent: 12/8/2005 9:21 PM. |
|---|---|---|
| To: [ - ] | Kathy Wacus/=Lexus/Toyota@Toyota. | |
| Cc: [ - ] | Stefan_Brand@toyota.com;Mark_kubota@toyota.com;kirk_forsht@toyota.com | |
| Bcc: [ - ] | dave_zellers@toyota.com; | |
| Subject: | CONFIDENTIAL - IS 250 AWD Draft Owner Letter and Q&A. | |

Kathy:

Approved by TMC.


They pulled out the "vehicle speed control" part. NHTSA may come back, but TMC wanted to try.

George Morino
Quality Compliance Manager
Toyota Motor Sales, U.S.A., Inc.
Tel. 310-468-3392
Fax 310-468-3399

NOTICE: This email message and all attachments transmitted with it are intended solely for the use of the addressee and may contain legally privileged and confidential information. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, copying, or other use of this message or its attachments is strictly prohibited.

If you have received this message in error, please notify the sender immediately by email reply and please delete this message from your computer. Thank you.

EXHIBIT 8

| | | Sent:4/2/2007 7:59 AM |
|---|---|---|
| From: | George Morino/=TMS/Toyota. | |
| To: [ - ] | Chuck Yaeger;Denise Jacobson/=Lexus/Toyota@Toyota. | |
| Cc: [ - ] | Kirk Forsht/=TMS/Toyota. | |
| Bcc: [ - ] | george_morino@toyota.com. | |
| Subject: | (REVISED) ES 350 NHTSA Preliminary Evaluation Q&A. | |

Chuck and Denise:

Sorry we had a last minute change to the Q&A. Please utilize this revised version of the Statement and Q&A.
The issue has been posted on the NHTSA website.

Sorry!

[Old]
NHTSA has received five consumer complaints regarding unintended throttle control in the subject vehicles.

[New]
NHTSA received five consumer where the All Weather Floor Mat may have interfered with the accelerator pedal operation.

[Changed Version]
Statement:
On March 29, 2007, the National Highway Traffic Safety Administration ("NHTSA") opened an investigation called a Preliminary Evaluation on certain 2007 model year Lexus ES 350 vehicles. NHTSA is concerned that if the Lexus All Weather Floor Mat is installed on top of the existing Lexus Carpeted Floor Mats, the All Weather Floor Mats would not be secured by the retaining hooks (clips) and may slip forward interfering with the accelerator pedal. NHTSA has received five consumer complaints where the All Weather Floor Mat may have interfered with the accelerator pedal operation.

A Preliminary Evaluation is an early-stage inquiry to determine if further analysis (an Engineering Analysis) is warranted; this is not a recall. Lexus is currently cooperating fully with the agency in its efforts to investigate the allegations.

Q2: What prompted NHTSA to investigate these issues?
A2: NHTSA received five consumer where the All Weather Floor Mat may have interfered with the accelerator pedal operation. Based upon consumer interviews, the agency believes that the accessory Lexus All Weather Floor Mat, if not properly installed, may interfere with the accelerator pedal on certain 2007 model year Lexus ES 350 vehicles.

George Morino
National Manager
Quality Compliance Department
Product Quality and Service Support
Toyota Motor Sales, U.S.A., Inc.
Tel. 310-468-3392
Fax 310-468-3399

NOTICE: This email message and all attachments transmitted with it are intended solely for the use of the addressee and may contain legally privileged and confidential information. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, copying, or other use of this message or its attachments is strictly prohibited.

If you have received this message in error, please notify the sender immediately by email reply and please delete this message from your computer. Thank you.

EXHIBIT 9

| From: | Christopher Tinto/=WDC/Toyota_NY | Sent:9/16/2007 10:26 AM |
|---|---|---|
| To: [ - ] | Jo Cooper/=WDC/Toyota_NY@Toyota_NY. | |
| Cc: [ - ] | | |
| Bcc: [ - ] | | |
| Subject: | Re: ES350 recall/NHTSA meeting. | |

U da best ma'am.

Thanks

Chris

-------------------------------
Chris Tinto
Vice President, Toyota Motor North America Inc
Sent from Wireless hand held


From: Jo Cooper
Sent: 09/15/2007 07:16 PM
To: Christopher Tinto
Subject: Fw: ES350 recall/NHTSA meeting

Fyi...

Have a good weekend! Jo
-------------------------
Josephine S. Cooper
Group Vice President
TOYOTA MOTOR NORTH AMERICA
(202) 468-1990



From: Jo Cooper
Sent: 09/15/2007 07:15 PM
To: Jim Lentz; Don Esmond; Bob Carter; Dave Illingworth
Cc: Shigeru Hayakawa; Shinichi Goto
Subject: Fw: ES350 recall/NHTSA meeting

Gentlemen:

thought you would be interested in the outcome--and the avoidance of much bigger issues (and costs). The TMA
and TMS team did a good job...

Best regards, Jo
-------------------------
Josephine S. Cooper
Group Vice President
TOYOTA MOTOR NORTH AMERICA
(202) 468-1990



From: Christopher Tinto
Sent: 09/14/2007 04:40 PM
To: Jo Cooper

EXHIBIT 10

Subject: ES350 recall/NHTSA meeting (Revised - IGNORE PREVIOUS VERSION)

Jo:

I just wanted to fill you in on the NHTSA meeting and negotiations yesterday regarding the ES350 floor mat issue. Working with TMC QD and TMS service, we were able to put together enough material in the short time allotted by the agency to convince NHTSA to accept our proposal.

In a nutshell - we will 'recall' the '07 ES and Camry floor mat, however, we will NOT declare that a 'safety defect' exist in either the vehicles or the mat, for the purposes of the required notification to the agency (under Part 573). (Of course, the owner letter will say that a defect WAS found in the mat, to insure that owners pay attention to the notice and secure the mats correctly - the language of which is required by law). Customers will be notified that they should correctly install the mats to insure no interference with the throttle until Toyota is ready to provide replacement mats.

We believe that this remedy is a reasonable response on Toyota's part, given that the cause of the problem is that the mats are being improperly installed (i.e. double stacked) and left unsecured, contrary to their intended design. We also believe that there is nothing unique about Prius, Avalon, and IS250/350 (i.e. NHTSA's other interest) vs. other make/models on the road, and therefore no field action is required.

Of note, NHTSA was beginning to look at vehicle design parameters as being a culprit, focusing on the accelerator pedal geometry coupled with the push button 'off' switch. We estimate that had the agency instead pushed hard for recall of the throttle pedal assembly (for instance), we would be looking at upwards of $100M + in unnecessary cost.

Please let me know if you have any questions.

Best Regards,
Chris

PS - Special thanks should be noted for the TMS-service guys, as they did the lions share of the work at the last minute, providing enough good information to convince the agency that this issue is NOT unique to Toyota products.

Chris Tinto
**********************************************
Vice President, Technical and Regulatory Affairs, Safety
Toyota Motor North America, Inc.
601 13th St. NW
Suite 910 South
Washington, DC 20005
Phone (202) 463-6824
NEW CELL NUMBER - (202) 412-7822
email: Chris_Tinto@tma.toyota.com

EXHIBIT 10

| From: | George Morino/=TMS/Toyota | Sent: 9/18/2007  11:28 AM |
|---|---|---|
| To: [ - ] | Christopher Tinto/=WDC/Toyota_NY@TOYOTA_NY;csantucci@tma.toyota.com | |
| Cc: [ - ] | Kirk Forsht/=TMS/Toyota;Michiteru Kato/=HINPO/TMC0@TMC0 | |
| Bcc: [ - ] | | |
| Subject: | CONFIDENTIAL - DRAFT Documents | |

Hi Chris and Chris:

We greatly appreciate your hard work in dealing with these issues. Mitch requested that I have you review the DRAFT Owner Letter and Press Release prior to us taking it further within TMS. Please don't share these documents with any other party yet.

[DRAFT Owner Letter (Lexus version)]

The Camry letter would basically be the same with the exception of the vehicle brand/name (picture of the mat will also say Camry) and the following additional bullet point in the "What if you experience accelerator pedal interference prior to your appointment?" section:
In a traditional key ignition vehicle, if you can safely stop the vehicle, turn the ignition key to the ACC position. Again, by turning the key to the ACC position, you will lose both power brake assist and power steering. Do not remove the key from the ignition. If you remove the key from the ignition, the steering wheel will lock.

[DRAFT Press Release]

I thought about including the following paragraph in the Press Release, but then it starts to sound like something is wrong with the vehicle and we are trying to hide it. It begs the question, "why don't you fix something in all the vehicles so it can't happen with any mat?" therefore I didn't include it. What do you think?

If the 2007 through early 2008 model year Camry or ES 350 vehicle does not have the Toyota or Lexus All Weather Floor Mat, it is NOT involved in this recall. However, during our investigation, it was noted that floor mat interference is possible in any vehicle with any combination of floor mats. Therefore, if non-Lexus floor mats are utilized, please owners are requested to make sure they are also properly secured using the appropriate retention device and not place them on top of another floor mat.

We also didn't include the START/STOP button procedures in the Press Release. A person hearing what to do on news radio, a spouse communicating to spouse that they saw something on the news, running to the get a paper and pencil to write down the information just lends itself to mass confusion. Instead, we are preparing to quickly begin mailing the owner letter (within one week) of x-day. We felt an owner letter is something the customer can refer to and keep.

A slightly earlier version of both DRAFT Owner Letter and was already reviewed with TMS Legal. We need to run the Press Release by Corporate Communications after you have an opportunity to comment and as we get closer to x-day.

We greatly appreciate your assistance.

George Morino
National Manager
Quality Compliance Department
Product Quality and Service Support
Toyota Motor Sales, U.S.A., Inc.
Tel. 310-468-3392
Fax 310-468-3399

NOTICE: This email message and all attachments transmitted with it are intended solely for the use of the addressee and may contain legally privileged and confidential information. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, copying, or other use of this message or its attachments is strictly prohibited.

If you have received this message in error, please notify the sender immediately by email reply and please delete this message from your computer. Thank you.

EXHIBIT 11

| From: | Chris Santucci/=WDC/Toyota_NY | Sent:5/5/2009 12:50 PM. |
|---|---|---|
| To: [ ] | Takeharu Nishida/=HINPO/TMC0@TMC0@TMCE@TOYOTA. | |
| Cc: [ ] | Christopher Tinto/=WDC/Toyota_NY@Toyota_NY,Jyunji Ogata/=HINPO/TMC0@TMC0;Michiteru Kato/=HINPO/TMC0@TMC0@TMCE@TOYOTA. | |
| Bcc:[ ] | | |
| Subject: | Re:Defect Petition. | |

Nishida-san,

For background, NHTSA did inspect the petitioner's vehicle. While they did not see clearly the witness marks of the carpeted floor mat on the carpet in the forward, unhooked position, they do suspect that the floormat was responsible for the petitioner's issue.

I have discussed our rebuttal with them, and they are welcoming of such a letter. They are struggling with sending an IR letter, because they shouldn't ask us about floormat issues because the petitioner contends that NHTSA did not investigate throttle issues other than floormat-related. So they should ask us for non-floormat related reports, right? But they are concerned that if they ask for these other reports, they will have many reports that just cannot be explained. And since they do not think that they can explain them, they don't really want them. Does that make sense? I think it is good news for Toyota.

Regards,

Chris Santucci - Assistant Manager
Technical and Regulatory Affairs
Toyota Motor North America, Inc.
Ofc (202) 463-6856 Cell (202) 651-1581 Fax (202) 463-8513
email: csantucci@tma.toyota.com

Note: We cannot receive attachment extensions listed below.
.exe, .com, .pif, .scr, .cmd, .bat, .vbs, .lnk, .htm, .html, .shs, .mdb, or .zip

---

Nishida-san,

Here is the draft rebuttal to the Defect Petition. Let me know what you think.

Regards,

Chris Santucci - Assistant Manager
Technical and Regulatory Affairs
Toyota Motor North America, Inc.
Ofc (202) 463-6856 Cell (202) 651-1581 Fax (202) 463-8513
email: csantucci@tma.toyota.com

Note: We cannot receive attachment extensions listed below.
.exe, .com, .pif, .scr, .cmd, .bat, .vbs, .lnk, .htm, .html, .shs, .mdb, or .zip

EXHIBIT 12



# TRA Safety - Current Responsibilities

1. **Monitor and Affect Regulation & Legislation**
   - NHTSA, Congress, OMB, FCC, etc.
   - Alliance SPC & WGs Policy; Public/Docket comments
   - Meetings with Gov't agencies/Hill

2. **Vehicle Defect/Compliance and 3rd Party Crash Testing**
   - Coordinate Responses/Negotiations on NHTSA Investigations/Recalls/EWR with Gov't /test labs
   - NCAP Consumer Info / IIHS testing; Attend Tests, Provide Data and Analysis

3. **Manage/Coordinate/Expand TMC Safety Research w/Outside Entities**
   - Universities/Labs (VT, UVa, etc.); CIREN Trauma Center
   - GM/CAT Cooperative Project (Safety); ACAT/NHTSA
   - Sponsorship of Crash Safety Conferences /Safety Initiatives

4. **ITS/VII activities  (Regulatory/legislative implications)**
   - Privacy/Policy issues; TMC/TTC coordination
   - ITS America/World Congress; VII Executive Leadership Team; VII-C issues

5. **Support PR Activity to Enhance Toyota's Image w/ Government/Public**
   - Work with TMS PR; Media interviews/ background
   - Affiliate Technical briefings

6. **Monitor Market Trends Related to Safety**
   - Competitors, media, NGOs

EXHIBIT 13





# Key Safety Issues

- U.S. DOT/NHTSA under Obama Administration not industry-friendly



OEMs anticipate a more challenging regulatory and enforcement environment, with potential for revisiting key regulatory proposals

- NHTSA's new, more aggressive management includes more attorneys at the agency, even in the leadership of Rulemaking and Enforcement



The new regime has less understanding of engineering issues and are primarily focused on legal issues

EXHIBIT 13



# Key Safety Issues



**safercar.gov**

**Impact on "Quality"**

- Number of UIO (units in operation) increasing
- NHTSA is testing more vehicles under NCAP
- Nov 2000 "TREAD Act" requires new, more intensive, and regular reporting
  - A 5-day notification is required when recall determinations are made
  - New strong civil and criminal penalties were implemented
    - e.g. Ford/Firestone/rollover issue
- NHTSA is more sensitive to public/congressional criticism

**Resulting in more Investigations, and more forced recalls**

EXHIBIT 13









# Key Safety Issues

- **FMVSS 305 Compliance/Hybrid Sales**
  - Compliance Concerns/Sales Impact

- **New NCAP Test Protocol**
  - Lower Safety Ratings Affect Sales - Tundra Case

- **"Sudden Acceleration" on ES/Camry, Tacoma, LS, etc.**
  - Recurring issue, PL/Design implications

- **Cargo Carrying Capacity/FMVSS 110 Compliance**
  - Flaws in Toyota Regulatory and Defect Process

- **Prius Headlamps Investigation** - Class Action

- **"Quiet Cars" (Hybrids, EVs, FCHVs)**
  - NFB/Congressional/NHTSA/SAE activity

- **Kids in Cars**
  - BTSI, Power Windows, Rear Visibility Standards

EXHIBIT 13



# Key Safety Issues

## Challenges

- Expectations are rapidly rising for more Toyota leadership

- Detroit 3 unable to carry the burden on safety initiatives/regulatory work

  - Bankruptcy, conflicting interest with US gov't
  - Alliance is a difficult working atmosphere
  - Toyota resources challenged

## Recommendations

- Need improved process and tighter framework for decisions

  - Need better streamlining and faster decisions
  - Need much more support within Toyota for quality-related issues
    - Need more legal tie-in

- Regular communication with top levels of TMC

- Need to speak out more independently when appropriate for company

EXHIBIT 13

## Slide Notes

OEMs anticipate a more challenging regulatory and enforcement environment, with potential for revisiting key regulatory proposals

NHTSA's new, more aggressive management includes more attorneys at the agency, even in the leadership of Rulemaking and Enforcement

The new regime has less understanding of engineering issues and are primarily focused on legal issues

### Slide 3:

On "Quality" (i.e. Defects, Compliance, NCAP testing)

Number of UIO (units in operation) is increasing rapidly (i.e. increased exposure for defects/quality issues)

NHTSA is testing more vehicles under NCAP

Nov 2000 "TREAD Act" requires new, more intensive, and regular reporting of warranty, field reports, customer complaints, death and injury claims, etc.

A 5 day notification is required when recall determinations are made

New strong civil and criminal penalties were implemented for knowingly hiding a defect/recall, or less-than-timely reporting

e.g. Ford/Firestone/rollover issue

NHTSA is more sensitive to public/congressional criticism (now that all the tools have been granted to them by Congress)

Resulting in more Investigations, and more forced Recalls - even those that historically were not deemed "safety" in nature

### Slide 4:

EXHIBIT 13

# Slide Notes

FMVSS 305 Compliance/Hybrid Sales

Serious Compliance Concerns

Potential Sales Impact

New NCAP Test Protocol

Lower Safety Ratings Potentially Affect Sales

Tundra Case

"Sudden Acceleration" on ES/Camry, Tacoma, LS, etc.

Recurring issue

PL implications/TMC design

Cargo Carrying Capacity/FMVSS 110 Compliance

Flaws in Toyota Regulatory and Defect Process

Prius Headlamps Investigation

Class Action Implications

"Quiet Cars" (Hybrids, EVs, FCHVs)

NFB/Congressional/NHTSA/SAE activity

Roof Crush

Phase-in costly and difficult, Longer model life

Kids in Cars

BTSI, Power Windows, Rear Visibility Standards (cameras)

**Slide 5:**

Expectations are rapidly rising from NHTSA, Alliance, and the Public for more participation and leadership

Toyota's leadership is not only welcomed, it is expected

No longer bit player/importer

The Detroit 3 are unable to carry the burden on safety initiatives/regulatory work

Severely limited budgets, reduced manpower, bankruptcy

EXHIBIT 13

# Slide Notes

US Gov't controls large portion of GM, DCX – conflicting interest

Alliance is a difficult working atmosphere

Toyota resources challenged

Increasing need for informal outside Alliances (e.g. GM CAT)

Therefore, TMA prioritized key issues with TMC to insure focus and coordination

Better focused research/participation in key initiatives with full TMC support

Agreement on relative importance of issues


Recommendations

Process and tighter framework for getting decisions

need better streamlining and decision makers

Need much more support within Toyota for quality-related issues

Toyota needs to major on the majors

Regular communication with top levels of TMC

E.g. sudden accel, defect issues

Need to speak out more independently

Should embrace safety as a core value vs. model by model

Safety seminar

Sustainability seminar



Tighter coordination with TTC, TEMA, TMS;  Regular Reporting

EXHIBIT 13

# Slide Notes

**Slide 1:**

Monitor and Affect Regulatory and Legislative Movement

NHTSA., OMB, Congress, etc.

Act Through Alliance, Toyota independently

Technical Meetings with Automakers

Comments, Private mtgs, Industry

Vehicle Defect/Non Compliance Issues

NCAP consumer information/IIHS/3rd party testing

Attend tests, Provide data and analysis

Negotiation with stakeholders/Gov't/test labs

Manage/Coordination TMC safety research w/ Outside entities

Universities/Labs, etc.

Monitor market trends related to safety

Competitors, media, NGOs

Support PR activity to enhance Toyota's image w/Gov't/public

Work with TMS PR

Improved understanding amongst affiliates/technical briefings

Media interviews/background

**Slide 2:**

U.S. DOT/NHTSA under Obama Administration

Not industry friendly

Aligned with the safety advocate community

EXHIBIT 13

| From: | Katsuhiko Koganei/=TMS/Toyota. | | Sent:1/16/2010 7:57 PM |
|---|---|---|---|
| To: [ - ] | Irv Miller/=Exec/=TMS/Toyota@Toyota;mike_michels@toyota.com;hiro_fukui@toyota.com. | | |
| Cc: [ - ] | | | |
| Bcc: [ - ] | | | |
| Subject: | Re: Email from Koganei onJan.16 Re: Draft statement to respond to ABC News story | | |

Irv san, thank you for your message, and I understand our status. Kogi@BB

From: Irv Miller
Sent: 01/16/2010 07:05 PM PST
To: Katsuhiko Koganei
Cc: Mike Michels
Subject: Re: Email from Koganei onJan.16 Re: Draft statement to respond to ABC News story
Kogi,

I hate to break this to you but WE HAVE A tendency for MECHANICAL failure in accelerator pedals of a certain manufacturer on certain models. We are not protecting our customers by keeping this quiet. The time to hide on this one is over. We need to come clean and I believe that Jim Lentz and Yoshi are on the way to DC for meetings with NHTSA to discuss options.

We better just hope that they can get NHTSA to work with us in coming with a workable solution that does not put us out of business.

Irv Miller
Group Vice President, Environmental and Public Affairs
Toyota Motor Sales, Inc
19001 S. Western Ave.
Torrance, CA 90509

Katsuhiko Koganei/TMS/Toyota
01/16/2010 11:55 AM
To Mike Michels/TMS/Toyota@Toyota
cc masami_doi@mail.toyota.co.jp, keisuke_kirimoto@mail.toyota.co.jp, amiko_tomita@mail.toyota.co.jp, Akiko Kita/E/TMC0@TMC0@TMCE, John Hanson/TMS/Toyota@Toyota, Brian Lyons/TMS/Toyota@Toyota, Hiroshi Yoshihashi/TMS/Toyota@Toyota, Hiro Fukui/TMS/Toyota@Toyota, Ryo Sakai/Admin/Avalon/Toyota_NY@TOYOTA_NY, Sumio Ohtsuji/WDC/Toyota_NY@Toyota_NY, Iwao Kimura/Admin/Avalon/Toyota_NY@Toyota_NY, wtCocpkc41@ezweb.ne.jp, wtCocpkc110@docomo.ne.jp, yfb22060@nifty.com, 1028m.doi@ezweb.ne.jp, Irv Miller/Exec/TMS/Toyota@Toyota
Subject Email from Koganei onJan.16 Re: Draft statement to respond to ABC News story

Dear Mike-san,

Thank you for your hard work while under this sunny weather...

Now I talked with you on the phone, we should not mention about the mechanical failures of acc. pedal, because we have not clarified the real cause of the sticking acc pedal formally, and the remedy for the matter has not been confirmed. I talked over this matter with Ryo-san, KC Kirimoto-san, and Doi-san, and all of them are concerned about the comment with mechanical failures might raise another uneasieness of customers.

Exhibit 14

(See the attached file. Red hilighted parts should be removed , I think.)

[attachment "Post ABC release 1-15 Kogi suggest.doc" deleted by Katsuhiko Koganei/TMS/Toyota]

Anyway, if you know further new information about this matter, following the conference call done between TMS PQSS, TMA (W.DC) and TMC JCQE, please update the information over this matter.

Especially, before the conference call of tomorrow (7PM at PST), I think we need to have consensus within TMS, (and also within TMA CC and TMC-PR, if possible).

So I would appreciate if you sent the newly drafted statement, and Q&A to the all CC members.

Now I myself is staying in Torrance (for some preparations of the movement to the new house)
I can have some meetings with you over this matter anytime, so do not hesitate to ask me to meet at TMS office.


Katsuhiko Koganei (Kogi)

Executive Coordinator
Corporate Communications

Toyota Motor Sales U.S.A. Inc.,

Tel +1-310-468-4725
Mobile +1-310-941-6946
e-mail Katsuhiko_Koganei@toyota.com


Ryo_Sakai@tma.toyota.com
01/16/2010 09:07 AM
To "Iwao Kimura" <IKimura@tma.toyota.com>, "Katsuhiko Koganei" <Katsuhiko_Koganei@toyota.com>
cc
Subject Fw: Draft statement to respond to ABC News story


I'm forwarding you this since you were not on the distibution.


----- Original Message -----
From: Mike Michels
Sent: 01/15/2010 06:37 PM PST
To: Gary Smith; Rick LoFaso; Webster Burns; Steve Haag; Dave Zellers;
Nancy Fein; Jane Beseda; Ko Igarashi; Shinji Yamaguchi
Cc: Charley Roberts; Ron Kirkpatrick; Christopher Reynolds; Bob Waltz;
Jim Wiseman; Ryo Sakai; Jo Cooper; Christopher Tinto; Sumio Ohtsuji; Martha
Voss; Cindy Knight; ejones@mayerbrown.com; Christopher Reynolds;
Masami_Doi@mail.toyota.co.jp; keisuke_kirimoto@mail.toyota.co.jp; Hiro
Fukui; mgross@rlmnet.com; Alicia McAndrews; Brian Lyons; Irv Miller; John
Hanson; Jim Wiseman
Subject: Draft statement to respond to ABC News story
REDACTED - PRIVILEGE

Exhibit 14



REDACTED - PRIVILEGE

Mike Michels
Vice President, Communications
Toyota Motor Sales USA, Inc.
19001 S.Western Ave.
Torrance, CA 90509
Phone: 310 468 7730
Mobile: 310 200 4968
Fax: 310 381 4500
mike_michels@toyota.com
[attachment "Post ABC release 1-15 6pm.doc" deleted by Katsuhiko Koganei/TMS/Toyota]

Exhibit 14